[Cite as *Hoffman v. Gallia Cty. Sheriff's Office*, 2017-Ohio-9192.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
GALLIA COUNTY

| | | |
|---|---|---|
| NICHOLAS G. HOFFMAN, et al., | : | |
| Plaintiffs-Appellees, | : | Case No. 17CA2 |
| vs. | : | |
| GALLIA COUNTY SHERIFF'S OFFICE, et al., | : | DECISION AND JUDGMENT ENTRY |
| | : | |
| Defendants-Appellants. | : | |
| | : | |

_____

APPEARANCES:

Mark Landes and Aaron M. Glasgow, Columbus, Ohio, for Appellants.

Jeffrey L. Finley, Gallipolis, Ohio, for Appellees.
_____

CIVIL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED: 12-12-17
PER CURIAM.

{¶ 1} This is an appeal from a Gallia County Common Pleas Court decision that denied summary judgment to Gallia County Sheriff Joseph R. Browning, Gallia County Sheriff's Deputy Randall G. Johnson, the Gallia County Sheriff's Department, and the Gallia County Commissioners, defendants below and appellants herein.[1] The trial court determined that genuine issues of material fact remain as to whether appellants are immune from liability under

---

[1] A trial court's decision that denies a summary judgment motion ordinarily is not a final, appealable order. R.C. 2744.02(C), however, states that "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order." In *Hubbell v. Xenia*, the Ohio Supreme Court interpreted this provision to mean that an appellate court "must exercise jurisdiction over an appeal of a trial court's decision overruling a Civ.R. 56(C) motion for summary judgment in which a political subdivision or its employee seeks immunity." *Id.*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶21. We therefore have jurisdiction to review the trial court's summary judgment decision to the extent it denied appellants the benefit of an alleged immunity from liability.

R.C. Chapter 2744 for the injuries suffered by Nicholas G. Hoffman and Tonnette D. Hoffman, plaintiffs below and appellees herein.   Appellants assign the following errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ERRED IN FINDING THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS REGARDING WHETHER APPELLANT JOHNSON ACTED IN A 'WANTON AND WILLFUL MANNER' UNDER R.C. 2744.02(B)(1)(a)."
>
> SECOND ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ERRED IN FINDING THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS REGARDING WHETHER APPELLANT JOHNSON ACTED WITH MALICIOUS PURPOSE, IN BAD FAITH OR IN A WANTON OR RECKLESS MANNER UNDER R.C. 2744.03(A)(6)(b)."

I

BACKGROUND

{¶ 2}   This appeal arises out of a May 29, 2010 automobile collision involving Gallia County Sheriff's Deputy Randall Johnson and Ohio State Highway Patrol Trooper Nicholas G. Hoffman.   Before the accident occurred, both Deputy Johnson and Trooper Hoffman were responding to a call for help from Ohio State Highway Patrol Trooper Keith Fellure.   Trooper Fellure indicated that he had located a vehicle involved in a "rolling domestic" on Left Fork Road and requested assistance with the three individuals found with the vehicle.

{¶ 3}   While Deputy Johnson and Trooper Hoffman were en route to assist Trooper Fellure, both reached speeds over 100 miles per hour.   Trooper Hoffman's vehicle was in front of Deputy Johnson's vehicle, but at some point, Deputy Johnson lost sight of Trooper Hoffman's vehicle.   As Deputy Johnson topped a hill and rounded a slight curve, he saw Trooper

Hoffman's vehicle backing up in his lane of travel in order to turn left onto Left Fork Road. Deputy Johnson applied his brakes and swerved to the left of the center line in an attempt to avoid a collision, but was unable to stop his vehicle before colliding with Trooper Hoffman's vehicle. A subsequent crash investigation indicated that Deputy Johnson's vehicle was traveling around 65 to 74 miles per hour at the point of impact.

{¶ 4} Appellees subsequently filed a complaint and alleged that Deputy Johnson negligently, willfully, wantonly, and recklessly caused appellees' injuries. Appellants denied liability and additionally claimed that they are statutorily immune from liability under R.C. Chapter 2744.

A

SUMMARY JUDGMENT MOTIONS

{¶ 5} Both parties filed summary judgment motions. Appellees asserted that no genuine issues of material fact remain concerning appellants' liability for appellees' injuries and regarding appellants' statutory immunity. Appellees alleged that based upon the evidence in the record, reasonable minds could only conclude that Deputy Johnson operated his vehicle in a willful, wanton, and reckless manner when he responded to Trooper Fellure's call for assistance. Appellees claimed that Deputy Johnson's conduct was willful, wanton, and reckless for the following reasons: (1) he was traveling between 101-106 mph on a two-lane roadway with a 55 mph speed limit; (2) his speed was grossly excessive given the road contours; (3) he did not slow down as he approached the intersection of Jackson Pike and Left Fork Road; (3) he did not know the location of Left Fork Road; (4) he did not have sufficient training regarding high-speed emergency vehicle handling; (5) he drove left-of-center; (6) he did not exhibit due regard for

safety; (7) he was unaware of a departmental policy concerning officer conduct when responding to an emergency call; and (8) after the accident, the sheriff ordered Deputy Johnson to complete an emergency vehicle course. Appellees argued, therefore, that appellants are not statutorily immune from liability.

{¶ 6} Appellants also asserted that no genuine issues of material fact remain as to whether they are statutorily immune from liability under R.C. 2744.02(B)(1)(a) and 2744.03(A)(6)(a). In contrast to appellees' argument, however, appellants claimed that reasonable minds could only conclude that Deputy Johnson's conduct was not willful, wanton, or reckless.[2] They argued that Johnson's operation of his vehicle did not constitute willful, wanton, or reckless conduct for the following reasons: (1) Deputy Johnson activated his lights and sirens; (2) Deputy Johnson was responding to a fellow officer's call for help; (3) Deputy Johnson was traveling in his own lane; (4) Trooper Hoffman reversed his vehicle in Deputy Johnson's lane of travel; (5) the roadway was dry and it was clear day; (6) traffic was light; (7) there were no intersections with traffic control devices along the route; (8) Deputy Johnson applied his brakes and attempted to swerve to avoid Trooper Hoffman's cruiser; and (9) Deputy Johnson did not violate the sheriff's office emergency run response policy. Appellants further argued that despite Deputy Johnson's speed, none of the evidence shows that Johnson's decision to exceed the speed limit posed an obvious risk to others or presented a high likelihood that injury would result. They additionally contended that even if Deputy Johnson's training was not as extensive as Trooper Hoffman's, he did not lack any training or know that he would be unable

---

[2] Appellants further argued that the Gallia County Sheriff's Department is not an entity that is capable of being sued. We address this issue *infra*.

to control a vehicle traveling over 100 miles per hour.

B

SUMMARY JUDGMENT EVIDENCE

{¶ 7}  The parties primarily relied upon the deposition testimony to support their summary judgment motions.  Appellants additionally presented a copy of the sheriff's emergency-run policy.

1

Sheriff's Emergency-run Policy

{¶ 8}  The policy states: "During emergency runs, employees must always give due regard to all other vehicles using the roadways. * * * * [T]he law does not relieve the vehicle operator from the duty to drive with due regard for the safety of all persons and property upon the highway."[3]  The policy further provides that "[e]mployees' driving actions must be very cautious–slowing at all intersections and sometimes even stopping."

2

Deputy Johnson

{¶ 9}  Deputy Johnson stated that before the accident occurred, he heard a dispatch regarding a motor-vehicle-domestic-violence situation.  The dispatch indicated that the suspect vehicle was traveling towards Jackson Pike.  Deputy Johnson headed westbound on Jackson Pike, behind an Ohio State Highway Patrol cruiser. Deputy Johnson related that he and the patrol

---

[3] The affidavit that incorporates the policy states that the policy was in effect on "May 29, 2011."  We point out, however, that the accident occurred on May 29, 2010.  It is not clear if the reference to 2011 is a typo.  Appellants' argument appears to indicate that the policy was in effect at the time of the accident.  Appellees have not addressed the issue.  We will presume that the reference to 2011 is a typo.

cruiser were "going in and out of traffic at a high rate of speed," but he slowed down due to heavy traffic and eventually lost sight of the vehicle. Shortly thereafter, Deputy Johnson met Trooper Hoffman in a parking lot. They discussed the suspect vehicle. Deputy Johnson then heard Trooper Fellure state over the radio that he had tracked the suspect vehicle to Left Fork Road. Deputy Johnson indicated that neither he nor Trooper Hoffman knew the precise location of Left Fork Road, but both knew its general location. Both Deputy Johnson and Trooper Hoffman left the parking lot and headed eastbound on Jackson Pike, towards Left Fork Road. Deputy Johnson stated that, at some point, he lost sight of Trooper Hoffman's vehicle. While en route to Trooper Fellure's location, Deputy Johnson heard Trooper Fellure radio that he located the suspect vehicle and it had crashed. Trooper Fellure indicated that there were multiple suspects and asked for assistance. Deputy Johnson stated that once Trooper Fellure requested assistance, he accelerated and activated his lights and sirens. Deputy Johnson continued on a straight stretch of road before topping a hill.

{¶ 10} As Deputy Johnson topped the hill and rounded a "little" curve, he saw Trooper Hoffman's vehicle backing up in Deputy Johnson's lane of travel and trying to turn left onto Left Fork Road. Deputy Johnson hit the brakes and tried to swerve to avoid Trooper Hoffman's vehicle, but was unable to do so. Deputy Johnson was unaware of how fast he was traveling, but in his written statement made shortly after the accident, he estimated that as he topped the hill, he was going approximately 70 mph. At the time of his deposition three years later, he could not state how fast he was going.

{¶ 11} Deputy Johnson stated that he is familiar with Jackson Pike, the road upon which the accident occurred. He indicated that he drives by the accident scene every day when he

travels to work. Deputy Johnson related that he is familiar with the hill and the curve–the point where he noticed Trooper Hoffman's vehicle. He stated that while he did not know how fast he was traveling on May 29, 2010, he did not believe he was traveling too fast for the hill and curve conditions. Deputy Johnson further indicated that he believes the distance between the top of the hill and the location of Trooper Hoffman's vehicle was a couple hundred yards.

{¶ 12} Deputy Johnson explained that he became employed as a part-time sheriff after he completed the Ohio Police Officers Training Academy (OPOTA) in 2007. Deputy Johnson stated that part of training including a driving course and that although the driving course did not cover high-speed maneuvering, it did include braking, maneuvering, and high-speed driving. He indicated that every few months, he returns to OPOTA for training classes.

{¶ 13} Deputy Johnson stated that at the time of the accident, he did not know whether the sheriff's office had a written policy regarding emergency-response calls. He explained that he was trained to use lights and sirens during an emergency run and to travel with "regards to safety." Deputy Johnson denied that he was disciplined as a result of the accident. He stated that the sheriff did, however, place "a letter * * * in [his] file about taking a driving course."

3

Trooper Hoffman

{¶ 14} Trooper Hoffman stated that on the date of the accident, he received a dispatch regarding a "rolling domestic." Trooper Hoffman explained that a "rolling domestic" involves a domestic violence situation in which the individuals are traveling in moving vehicles.

{¶ 15} Trooper Hoffman related that he located the suspect vehicle and attempted to stop the vehicle, but the vehicle failed to yield. Trooper Hoffman thus initiated a pursuit. He

followed the vehicle to Jackson Pike. Traffic became congested and he discontinued his pursuit. Trooper Hoffman then drove to a parking lot and Deputy Johnson subsequently appeared. Trooper Hoffman gave Deputy Johnson the description of the suspect vehicle and asked him if he had seen it. Trooper Hoffman then heard Trooper Fellure state over the radio that he found a vehicle involved in a crash on Left Fork Road. Trooper Hoffman departed for the accident scene.

{¶ 16} Trooper Hoffman stated that he did not activate his lights and sirens, but he did exceed the speed limit so as to not "wast[e] time." Trooper Hoffman estimated that he traveled between 80-85 mph during the three-and-one-half mile stretch to Left Fork Road. He does not believe that he acted recklessly or wantonly by exceeding the speed limit. Trooper Hoffman explained that while en route to Left Fork Road, he did not encounter much traffic and he did not need to pass any vehicles. Moreover, Trooper Hoffman stated that although "[t]here is a slight bend to the road," he would not "call it a curve."

{¶ 17} Trooper Hoffman explained that he was unaware Deputy Johnson had followed him until he noticed Deputy Johnson's vehicle in the rear-view mirror. Trooper Hoffman stated that he noticed Deputy Johnson's vehicle just before he started backing up to turn left onto Left Fork Road. Trooper Hoffman believed Johnson was around "a quarter mile or better behind [him]." Hoffman explained that Deputy Johnson "was far enough behind [him], [that he] knew [he] had a safe amount of time to make [the] turn."

{¶ 18} Trooper Hoffman related that he underwent a six-month training course at the Ohio State Patrol Academy, with approximately two weeks dedicated to driver-training skills, such as defensive driving skills, maneuverability skills, high-speed-precision maneuverability,

vehicle pursuits, inclement weather driving, and driving in tandem with another vehicle. Trooper Hoffman additionally related that he completes yearly in-service training that includes supplemental driver training. Trooper Hoffman stated that when employed as a trooper, he commonly drove over 100 miles per hour, even while en route to routine calls. The fastest he has ever driven in a patrol cruiser is 147 miles per hour.

{¶ 19} Trooper Hoffman explained that the standard applicable to law enforcement officers conducting emergency runs is "due regard for safety of the other motorists around you." He agreed that some emergency runs necessitate exceeding the posted speed limit.

4

Henry Lipian

{¶ 20} Appellees' expert witness, Henry Lipian, testified that he conducted an accident reconstruction primarily to determine the speed of Deputy Johnson's vehicle at the time of the accident. Lipian explained that his analysis showed that Deputy Johnson's vehicle was traveling between 101 and 106 miles per hour at the point where visible tire marks appeared on the road and between 66 and 74 miles per hour at the point of impact. Lipian stated that the reconstruction indicates that Deputy Johnson "was swerving to the left while at the same time engaging in a hard braking event."

{¶ 21} Lipian further opined that Johnson's conduct was reckless. Lipian stated, "the speed in and of itself, to me, is a recklessly high speed." He explained how he reached his conclusion: "One of the things I kind of apply is even on my most liberal analysis, if I were to stop somebody, when I was still a policeman, for a speed that I'm looking at, would I consider giving them a warning? No. You're not getting a warning for going 100 miles an hour in a 55

zone approaching an intersection." Lipian did not believe that there is any "justification for that kind of speed." Lipian further stated that combining Deputy Johnson's excessive speed "with an inexperienced officer who has minimal, if any, real legitimate training, who's part time, you know, that factors into it as well." Lipian believed that an individual with "a considerable amount of driver's training, maybe even a driving instructor, [who] has a lot of experience," might be able to "push the envelope a little bit more on certain conditions where you can drive faster."

{¶ 22} In his written report, Lipian stated that "[t]he nature of the emergency call did not justify [Deputy Johnson's] heedless disregard for the safety of the motoring public." Lipian indicated that Deputy Johnson did not possess "the requisite training either in classroom or on-the-road training, and as a part-time officer he did not have the overall experience to operate a patrol car at such high speeds as would a more highly trained officer." Lipian ultimately concluded that Deputy Johnson "displayed a flagrantly reckless lapse of due care. There was no justification for the high speed he was operating at, especially upon the approach to the intersection and coming up behind Trooper Hoffman. His speed was unsafe, unreasonable and completely unjustified."

5

Sergeant Fred Cook

{¶ 23} OSHP Sergeant Fred Cook testified that he conducted an accident reconstruction. His analysis indicated that Deputy Johnson was traveling between 89 and 97 miles per hour when he started to skid and 65 to 72 miles per hour at the time of impact. Sergeant Cook stated that he also examined the power train control module from Trooper Hoffman's vehicle. It indicated

that twenty seconds before impact, Hoffman's vehicle had been traveling 107.7 miles per hour and continued decelerating until it reached zero. The accident investigation report that Sergeant Cook prepared indicates that as one approaches the accident scene from the west, as Deputy Johnson was, the roadway slopes downward with a gradual curve to the left and there is over 1100 feet of visibility.

6

Trooper Fellure

{¶ 24} Trooper Fellure testified that on the date of the accident, he tracked the suspect vehicle to Left Fork Road. He radioed in the information and drove down Left Fork Road. When Trooper Fellure encountered the vehicle, it was sitting in a ditch and three individuals were standing outside of the vehicle. He ordered them to the ground, but "[t]hat wasn't going to happen." Trooper Fellure explained that the individuals "started running right at [him]," and he used his shoulder microphone to call for help. He does not recall the precise words he used to call for help, or if his "voice was amped up on the radio where [other officers] could tell, hey, we've go to get there or not, you know." Trooper Fellure also could not recall whether he used a code, such as "87," which means he needs backup, or "88," which means "officer in trouble."

C

TRIAL COURT'S DECISION

{¶ 25} On January 20, 2017, the trial court overruled the parties' summary judgment motions. The court determined that genuine issues of material fact remain regarding whether Deputy Johnson operated his vehicle in a willful, wanton, or reckless manner. This appeal followed.

II

ASSIGNMENTS OF ERROR

{¶ 26} Appellants' two assignments of error challenge the propriety of the trial court's decision to deny their summary judgment motion.   Appellants contend that the trial court incorrectly determined that genuine issues of material fact remain concerning whether they are entitled to statutory immunity under R.C. Chapter 2744.   Because the two assignments of error raise related issues, for ease of analysis we combine our discussion of them.

A

STANDARD OF REVIEW

{¶ 27} We initially note that appellate courts conduct a de novo review of a trial court's summary judgment decision.   *E.g., Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶14 (stating that "court reviews a grant of summary judgment de novo"); *Bohlen v. Anadarko E & P Onshore, L.L.C.*, 150 Ohio St.3d 197, 2017-Ohio-4025, 80 N.E.3d 468, ¶10; *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).   Accordingly, an appellate court must independently review the record to determine if summary judgment is appropriate and need not defer to the trial court's decision.   *Argabrite* at ¶14 (explaining that de novo review means court "will consider the evidence as if for the first time–using the standard set out in Civ.R. 56");[4] *e.g., Greene v. Partridge,* 2016-Ohio-8475, 78 N.E.3d 197 (4th Dist.),

---

[4] In *Argabrite*, the Supreme Court concluded that the trial and appellate courts applied an incorrect legal standard. The court observed that it ordinarily would have remanded the matter to the lower court to apply the correct standard, but determined that the summary judgment standard-of-review allowed it to consider the issue.   It is unclear whether and to what extent *Argabrite* may have implicitly overruled or limited *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 604 N.E.2d 138 (1992).   In *Murphy*, the supreme court held:   "A reviewing court, even though it must conduct its own examination of the record, has a different focus than the trial court.   If the trial court does not consider all the evidence before it, an appellate court does not sit as a reviewing court, but, in effect, becomes a trial court."   *Id.* at 360.   In reliance on *Murphy*, this court has stated that "we, as an appellate court, should not first

¶13; *Brown v. Scioto Bd. of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th

Dist.1993); *Morehead v. Conley*, 75 Ohio App.3d 409, 411–12, 599 N.E.2d 786 (4th Dist.1991).

To determine whether a trial court properly granted a summary judgment motion, an appellate

court must review the Civ.R. 56 summary judgment standard, as well as the applicable law.

*Snyder v. Ohio Dept. of Nat. Resources*, 140 Ohio St.3d 322, 2014-Ohio-3942, 18 N.E.3d 416,

¶2.

B

SUMMARY JUDGMENT STANDARD

{¶ 28} Civ.R. 56(C) provides in relevant part:

> * * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶ 29} Thus, pursuant to Civ.R. 56, a trial court may not grant summary judgment unless

the evidence demonstrates that: (1) no genuine issue of material fact remains to be litigated; (2)

the moving party is entitled to judgment as a matter of law; and (3) after viewing the evidence

---

consider an argument that the trial court did not address." *Lang v. Holly Hill Motel, Inc.*, 4th Dist. Jackson No. 05CA6, 2005–Ohio–6766, ¶22; *accord Stotts v. Stotts*, 4th Dist. Athens No. 16CA14, 2017-Ohio-5738, 2017 WL 2882174, ¶16; *Kearns v. Meigs County Emergency Medical Services*, — N.E. 3d —, 2017-Ohio-1354 (4th Dist.), ¶23. *Argabrite*, suggests, however, that appellate courts that are reviewing summary judgment decisions can consider issues that the trial court did not. Nevertheless, because this case does not require us to consider issues that the trial court did not, we need not resolve whether *Argabrite* overrules our prior cases that declined to address issues in the summary judgment context when the trial court did not first consider them.

most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party. *E.g., Bohlen* at ¶10, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *Snyder* at ¶20; *Vahila v. Hall*, 77 Ohio St.3d 421, 429–30, 674 N.E.2d 1164 (1997).

{¶ 30} The purpose of Civ.R. 56 "is to enable movement beyond allegations in pleadings and to analyze the evidence so as to ascertain whether an actual need for a trial exists. Because it is a procedural device to terminate litigation, summary judgment must be awarded with caution." *Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau*, 88 Ohio St.3d 292, 300, 725 N.E.2d 646 (2000) (citations omitted). Thus, a court that is reviewing a summary judgment motion must construe all reasonable inferences that can be drawn from the evidentiary materials in a light most favorable to the nonmoving party. *Moore v. E.I. DuPont de Nemours Co.*, 4th Dist. Pickaway No. 15CA12, 2015-Ohio-5331, 2015 WL 9305351, ¶20, citing *Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 485, 696 N.E.2d 1044 (1998), and *Turner v. Turner*, 67 Ohio St.3d 337, 341, 617 N.E.2d 1123 (1993). Moreover, a court must not "consider either 'the quantum' or the 'superior credibility' of evidence." *McGee v. Goodyear Atomic Corp.*, 103 Ohio App.3d 236, 242, 659 N.E.2d 317 (4th Dist. 1995). "The purpose of summary judgment is not to try issues of fact, but rather to determine whether triable issues of fact exist. * * * Thus, a court should not pass upon the credibility of witnesses or weigh the relative value of their testimony in rendering summary judgment." *Id.* at 242–43, 659 N.E.2d 317 (citation omitted.); *see also Koeth v. Time Savers, Inc.*, 11th Dist. Geauga No. 99–G–2211, 2000 WL 688826 (May 26, 2000) ("It is not the province of the trial court in a summary judgment exercise to either weigh the evidence before it, or to accept one party's interpretations of that evidence in

toto.").

{¶ 31} Under Civ.R. 56, the moving party bears the initial burden to inform the trial court of the basis for the motion and to identify those portions of the record that demonstrate the absence of a material fact. *Griffith v. Aultman Hosp.*, 146 Ohio St.3d 196, 2016-Ohio-1138, 54 N.E.3d 1196, ¶26; *Vahila*, *supra*; *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). The moving party cannot discharge its initial burden with a conclusory assertion that the nonmoving party has no evidence to prove its case. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 147, 677 N.E.2d 308 (1997); *Dresher*, *supra*. Rather, the moving party must specifically refer to the "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any," which affirmatively demonstrate that the nonmoving party has no evidence to support the nonmoving party's claims. Civ.R. 56(C); *Dresher*, *supra*.

{¶ 32} "[U]nless a movant meets its initial burden of establishing that the nonmovant has either a complete lack of evidence or has an insufficient showing of evidence to establish the existence of an essential element of its case upon which the nonmovant will have the burden of proof at trial, a trial court shall not grant a summary judgment." *Pennsylvania Lumbermens Ins. Corp. v. Landmark Elec., Inc.*, 110 Ohio App.3d 732, 742, 675 N.E.2d 65 (2nd Dist.1996). Once the moving party satisfies its burden, the nonmoving party bears a corresponding duty to set forth specific facts to show that a genuine issue exists. Civ.R. 56(E); *Dresher*, *supra*. "'Mere speculation and unsupported conclusory assertions are not sufficient'" to meet the nonmovant's reciprocal burden to set forth specific facts to show that a genuine issue exists. *Bank of New York Mellon v. Bobo*, 2015-Ohio-4601, 50 N.E.3d 229 (4th Dist.), ¶13, quoting *Loveday v.*

*Essential Heating Cooling & Refrig., Inc.*, 4th Dist. Gallia No. 08CA4, 2008-Ohio-4756, 2008 WL 4278129, ¶9. Additionally, "'resting on mere allegations against a motion for summary judgment * * * is insufficient'" to defeat a properly supported summary judgment motion. *Jackson v. Alert Fire & Safety Equip., Inc.*, 58 Ohio St.3d 48, 52, 567 N.E.2d 1027, 1032 (1991), quoting *King v. K.R. Wilson Co.*, 8 Ohio St.3d 9, 10–11, 455 N.E.2d 1282 (1983). Moreover, "conclusory affidavits that merely provide legal conclusions or unsupported factual assertions" and are insufficient to establish a genuine issue of material fact. *Moore v. Smith*, 4th Dist. Washington No. 07CA61, 2008-Ohio-7004, 2008 WL 5451340, ¶15 (citations omitted); *Wertz v. Cooper*, 4th Dist. Scioto No. 06CA3077, 2006-Ohio-6844, 2006 WL 3759831, ¶13, citing and quoting *Evans v. Jay Instrument & Specialty Co.*, 889 F.Supp. 302, 310 (S.D.Ohio 1995) ("'bald self-serving and conclusory allegations are insufficient to withstand a motion for summary judgment'"); *accord Stetz v. Copley Fairlawn Sch. Dist.*, 2015-Ohio-4358, 46 N.E.3d 165, ¶17 (9th Dist.), quoting *Brannon v. Rinzler*, 77 Ohio App.3d 749, 756, 603 N.E.2d 1049 (2d Dist.1991) ("'[s]tatements contained in affidavits must be based on personal knowledge and cannot be legal conclusions.'"); *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 357–358, 609 N.E.2d 216 (6th Dist.1992) (stating that a trial court considering a summary judgment motion is not required to accept conclusory allegations that are devoid of any evidence to create an issue of material fact).

{¶ 33} In the case at bar, we believe that appellants satisfied their initial burden to illustrate the absence of a genuine issue of material fact regarding their statutory immunity under R.C. 2744, and that appellees failed to respond with evidence demonstrating the existence of any genuine issues of material fact.

C

R.C. CHAPTER 2744

{¶ 34} R.C. Chapter 2744 sets forth the rules to determine whether a political subdivision and its employees are immune from liability. *Argabrite* at ¶6. A three-step analysis applies when determining a political subdivision's immunity from liability. *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 270, 2007-Ohio-1946, 865 N.E.2d 9, ¶14; *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶7; *Leasure v. Adena Local School Dist.*, 2012-Ohio-3071, 973 N.E.2d 810, ¶13-14 (4th Dist.). First, R.C. 2744.02(A)(1) sets forth the general rule that a political subdivision is immune from tort liability for acts or omissions connected with governmental or proprietary functions. *Cramer* at ¶14; *Colbert* at ¶7; *Harp v. Cleveland Hts.*, 87 Ohio St.3d 506, 509, 721 N.E.2d 1020 (2000). Second, R.C. 2744.02(B) lists five exceptions to the general immunity granted to political subdivisions under R.C. 2744.02(A)(1). *Cramer* at ¶15; *Ryll v. Columbus Fireworks Display Co.*, 95 Ohio St.3d 467, 470, 2002-Ohio-2584, 769 N.E.2d 372, ¶25. Finally, R.C. 2744.03(A) sets forth several defenses that a political subdivision may assert if R.C. 2744.02(B) imposes liability. *Cramer* at ¶16; *Colbert* at ¶9. The R.C. 2744.03(A) defenses then re-instate immunity.

{¶ 35} In the case at bar, the parties agree that R.C. 2744.02(B)(1)(a) defines the extent of the political-subdivision-appellants' immunity. R.C. 2744.02(B)(1)(a) states:

> (1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority. The following are full defenses to that liability:
> (a) A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency

> call and the operation of the vehicle did not constitute willful or wanton misconduct[.]

R.C. 2744.02(B)(1), therefore, generally allows political subdivisions to be held liable for a law enforcement officer's negligent operation of a motor vehicle while in the scope of employment. The statute does not, however, permit political subdivisions to be held liable for a law enforcement officer's operation of a motor vehicle while responding to an emergency call, unless the officer operated the vehicle in a willful or wanton manner.   R.C. 2744.02(B)(1)(a).

{¶ 36} The three-tier analysis does not apply to the individual employees of political subdivisions.  *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶36; *Cramer* at ¶17.   Instead, R.C. 2744.03(A)(6)(b) governs a political subdivision employee's individual immunity.  *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994) (stating that R.C. 2744.03(A)(6)(b) applies to individual employees).   R.C. 2744.03(A)(6) sets forth a presumption of immunity and states that a political subdivision "employee is immune from liability unless * * * * [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." *See Cook v. Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814 (1st Dist. 1995) (stating that political-subdivision-employee immunity analysis "begin[s] with a presumption of immunity"); *accord David v. Matter*, — N.E.3d —, 2017-Ohio-7351 (6th Dist.), ¶11 (explaining that R.C. 2744.03(A)(6) "gives rise to a presumption of immunity"); *Vlcek v. Chodkowski*, 2015-Ohio-1943, 34 N.E.3d 446 (2nd Dist.), ¶41 (stating that the "immunity statute creates a presumption of immunity" for political subdivision employees); *MacCabee v. Mollica*, 4th Dist. Athens No. 09CA32, 2010-Ohio-4310, ¶16 (stating that political subdivision employee presumed immune).

{¶ 37} Law enforcement officers are political subdivision employees. *See Fabrey*, 70 Ohio St.3d at 356 (applying R.C. 2744.03(A)(6)(b) immunity analysis to law enforcement officer's actions). Thus, under R.C. 2744.06(A)(6)(b), law enforcement officers "are immune from liability unless they act maliciously, in bad faith or in a wanton or reckless manner." *Argabrite* at ¶31. Consequently, an officer's mere negligence in the performance of official duties does not give rise to personal liability. *Fabrey*, 70 Ohio St.3d at 357 ("mere negligence in [officer's] official duties should not give rise to personal liability").

1

Question of Law

{¶ 38} Whether a political subdivision or its employee may invoke statutory immunity under R.C. Chapter 2744 generally presents a question of law.[5] *E.g., Nease v. Med. College Hosp.*, 64 Ohio St.3d 396, 400, 596 N.E.2d 432 (1992), quoting Roe v. Hamilton Cty. Dept. Of Human Servs., 53 Ohio App.3d 120, 126, 560 N.E.2d 238 (1st Dist. 1988) (citations omitted) ("'Whether immunity may be invoked is a purely legal issue, properly determined by the court prior to trial, and preferably on a motion for summary judgment'"); *Conley v. Shearer*, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992) (same); *accord Williams v. Glouster*, 4th Dist. No.

---

[5] We note that the Ohio Supreme Court has sent mixed messages regarding this issue, but its most recent pronouncements seem to indicate that if the underlying facts needed to resolve the immunity issue remain disputed, then summary judgment is not appropriate. *Argabrite* at ¶15 (framing immunity question as whether reasonable minds could conclude that employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner so as to preclude immunity and then determining as a matter of law that facts did not rise to level of wanton or reckless conduct); *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, 857 N.E.2d 573, ¶14 (stating that "[i]f a genuine issue of material fact remains, the court of appeals can remand the case to the trial court for further development of the facts necessary to resolve the immunity issue" and that "[a]lthough the issue of personal immunity is a question of law, whether an individual acted manifestly outside the scope of employment is a question of fact"); *see Siegel v. Univ. of Cincinnati College of Medicine*, 2015-Ohio-441, 28 N.E.3d 612, ¶¶16-17 (10th Dist.) ("we recognize that, in some instances, a factual dispute underlies the primary issue of law involved in determining the state's responsibility for an employee's actions. To the extent a factual dispute underlies the predominant legal

10CA58, 2012-Ohio-1283, 2012 WL 1029470, ¶15; *Long v. Hanging Rock*, 4th Dist. Lawrence No. 09CA30, 2011-Ohio-5137, 2011 WL 4584930, ¶17.   Whether a political subdivision employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner generally are questions of fact, however.   *Cannavino v. Rock Ohio Caesars Cleveland, L.L.C.*, 8th Dist. Cuyahoga No. 103566, 2017-Ohio-380, 2017 WL 444320, ¶26; *Long* at ¶17, citing *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, 857 N.E.2d 573; *Fabrey*, 70 Ohio St.3d at 356.   Thus, a trial court may not grant summary judgment on the basis of R.C. 2744.02(B)(1)(a) or 2744.03(A)(6)(b) immunity unless reasonable minds can only conclude that the employee did not act willfully, wantonly, maliciously, reckless, or in bad faith.   *Argabrite* at ¶15 (stating that summary judgment standard in statutory immunity context requires court to examine whether reasonable minds could conclude that the employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner); *Gates v. Leonbruno*, 70 N.E.3d 1110, 2016-Ohio-5627 (8th Dist.), ¶37.   If reasonable minds could disagree on these issues, then a court may not grant summary judgment based upon statutory immunity.   *Gates* at ¶37.

{¶ 39} The standard for showing that a political subdivision employee acted with malicious purpose, in bad faith, or in willful, wanton, or reckless manner is "rigorous" and "will in most circumstances be difficult to establish, especially with respect to a law-enforcement officer carrying out the statutory duty to arrest and detain a person violating the law."   *Argabrite* at ¶8 (citation omitted); *accord Caudill v. Columbus*, 10th Dist. Franklin No. 17AP-129, 2017-Ohio-7617, 2017 WL 4074583, ¶¶23-24.   Consequently, summary judgment usually is appropriate if the employee's conduct does not, as a matter of law, rise to the level of

determination of immunity, the trial court should conduct an evidentiary hearing to resolve that factual dispute.").

maliciousness, bad faith, willfulness, wantonness, or recklessness. *Caudill* at ¶24, citing *Scott v. Kashmiry*, Franklin No. 15AP-139, 2015-Ohio-3902, 42 N.E.3d 339 (10th Dist.), ¶20 (where "reasonable minds could only conclude that [an officer's] conduct was, at worst, negligent," then "the issue of immunity is an appropriate issue for resolution on summary judgment"). Accordingly, a court ordinarily may enter summary judgment in favor of a political subdivision and its employee if the employee's actions "showed that [the employee] did not intend to cause harm, * * * did not breach a known duty through an ulterior motive or ill will, did not have a dishonest purpose, and did not create an unnecessary risk of physical harm greater than that necessary to establish negligence." *Hackathorn v. Preisse*, 104 Ohio App.3d 768, 772, 663 N.E.2d 384 (9th Dist.1995).

{¶ 40} Furthermore, when reviewing the evidence in cases involving law enforcement officers, the Ohio Supreme Court has cautioned courts to "bear in mind that while many public employees face the potential for liability under R.C. 2744.03, no other public employee faces the potential danger, violence or unique statutory responsibilities a law-enforcement officer faces." *Argabrite* at ¶15. The court explained:

> Not only does Ohio law require an officer to arrest and detain a person who is violating the law, R.C. 2935.03(A)(1), it also subjects that officer to potential criminal liability for negligently failing to do so, R.C. 2921.44(A)(2).
>
> An officer's role in our society creates a unique lens through which to view his or her actions and through which to determine whether those actions may have been malicious, in bad faith, wanton or reckless. We expect law-enforcement officers to protect the public, but that expectation need not mean that an officer must sit idly by while a suspect flees the scene of a crime, particularly when the suspect's flight itself endangers the general public further. The danger of a high-speed chase alone is not enough to present a genuine issue of material fact concerning whether an officer has acted with a malicious purpose, in bad faith or in a wanton or reckless manner. *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 50–51, 772 N.E.2d 129 (9th Dist.2002).

*Id.* at ¶¶15-16.

{¶ 41} The Ohio Supreme Court has thus set forth an "onerous" standard to establish that a law enforcement officer is not entitled to immunity. *Argabrite* at ¶31 (stating that "the burden necessary to deny immunity to [law enforcement] officers is onerous"). In the case sub judice, the parties do not seriously dispute that the political-subdivision-appellants and Deputy Johnson are entitled to a presumption of immunity. Appellees have conceded that Deputy Johnson was responding to an emergency call within the meaning of R.C. 2744.02(B)(1)(a). Instead, the parties dispute whether the evidence establishes the existence of a genuine issue of material fact regarding whether Deputy Johnson operated his vehicle in a willful, wanton, or reckless manner so as to remove the presumption of immunity.[6] Thus, our analysis focuses upon whether the evidence in the record creates a genuine issue of material fact concerning whether Deputy Johnson operated his vehicle in a willful, wanton, or reckless manner, or whether reasonable minds could only conclude that Deputy Johnson did not operate his vehicle in a willful, wanton, or reckless manner.

2

Willful, Wanton, and Reckless Defined

{¶ 42} "'[W]illful,' 'wanton,' and 'reckless' describe different and distinct degrees of care and are not interchangeable." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, 2012 WL 6198607, ¶31.

{¶ 43} "Willful misconduct implies an intentional deviation from a clear duty or from a

---

[6] Appellees have not asserted that Deputy Johnson acted maliciously or in bad faith. We therefore need not address these issues.

definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id.* at ¶32, citing *Tighe v. Diamond*, 149 Ohio St. 520, 80 N.E.2d 122 (1948), and Black's Law Dictionary 1630 (8th Ed.2004) (describing willful conduct as the voluntary or intentional violation or disregard of a known legal duty). "The word, 'wilful,' used in the phrase, 'wilful misconduct,' implies intent, but the intention relates to the misconduct and not merely to the fact that some specific act, such as operating an automobile, was intentionally done. The intention relates to the commission of wrongful conduct, independent of the intent to use certain means with which to carry out such conduct." *Tighe*, 149 Ohio St. at 526–27. In the automobile context, the Ohio Supreme Court has explained that willful misconduct generally contemplates

> either the doing of an act with specific intent to injure [another], or, with full knowledge of existing conditions, the intentional execution of a wrongful course of conduct which he knows should not be carried out or the intentional failure to do something which he knows should be done in connection with his operation of the automobile, under circumstances tending to disclose that the motorist knows or should know that an injury to [another] will be the probable result of such conduct.

*Id.* at 527–28. Thus, "a mere error of judgment" ordinarily does not constitute willful misconduct. *Id.* at paragraph three of the syllabus.

{¶ 44} Wanton misconduct means "'the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.'" *Argabrite* at ¶8, quoting *Anderson* at paragraph three of the syllabus; *accord Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977), syllabus ("Where the driver of an automobile fails to exercise any care whatsoever toward those to whom he owes a duty of care, and his

failure occurs under circumstances in which there is great probability that harm will result, such failure constitutes wanton misconduct."); *see Tighe*, 149 Ohio St. at 526 (defining wanton misconduct as "an entire absence of all care for the safety of others and an indifference to the consequences").

{¶ 45} A court that is determining whether a defendant engaged in wanton misconduct thus essentially applies a two-part test. *See Matkovich v. Penn Cent. Transportation Co.*, 69 Ohio St.2d 210, 212, 431 N.E.2d 652 (1982) (explaining that determining whether railroad-defendant in personal injury action engaged in wanton misconduct involves a two-part test); *accord Thompson v. Smith*, 178 Ohio App.3d 656, 2008-Ohio-5532, 899 N.E.2d 1040 (11th Dist.), ¶40 (applying *Matkovich*'s two-part test in statutory immunity case). The first question is whether the defendant failed to exercise any care whatsoever toward those to whom he owes a duty of care. *Matkovich* at 212. This "requires that we determine the duty [the defendant] owed [to the plaintiff], and also the extent of care" that the defendant exercised. *Id.* The second question is whether the failure to exercise any care created a great probability that harm will result. *Id.* This requires courts to "consider the nature of the hazard created by the circumstances." *Id.* Furthermore, we note that in general, a defendant's "minimal efforts to warn [are] sufficient to overcome the allegation of wanton misconduct." *Id.*, citing *Pisel v. Baking Co.*, 61 Ohio St.2d 142, 399 N.E.2d 1243 (1980).

{¶ 46} "Reckless conduct" is "'characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the

circumstances and is substantially greater than negligent conduct.'"[7]  *Argabrite* at ¶8, quoting *Anderson*, paragraph four of the syllabus.   "[Recklessness] requires a finding that the probability of harm occurring is great and that the harm will be substantial.   A possibility or even probability is not enough as that requirement would place the act in the realm of negligence." *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174, 1176 (1987).   "Recklessness, therefore, necessarily requires something more than mere negligence.   In fact, 'the actor must be conscious that his conduct will in all probability result in injury.'"  *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶74, quoting *Fabrey*, 70 Ohio St.3d at 356.

{¶ 47} All three standards–willful, wanton, and reckless–describe conduct that is more than mere negligence.   Therefore, considering general negligence principles may be helpful when a court examines whether a political subdivision employee operated a motor vehicle willfully, wantonly, or recklessly so as to impose liability upon the political subdivision and its employee, individually, under R.C. 2744.02(B)(1)(a) and 2744.03(A)(6)(b) respectively.   If reasonable minds could only conclude that the employee's conduct demonstrates, at most, negligence, then summary judgment is appropriate.  *See Argabrite* at ¶34 (Lanzinger, J., concurring) (stating that R.C. 2744.03(A)(6)(b) means that "employees engaged in a governmental function will not be protected if their actions exceed the standard of negligence").

---

[7] Anderson indicated that in *Hawkins v. Ivy*, the court abandoned "disposition to perversity" as an element necessary to show wanton misconduct. *Anderson* at ¶28.  We note, however, that cases decided subsequent to *Hawkins* continued to include the "disposition to perversity" element when discussing wanton or reckless conduct. *See Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶37, quoting *Fabrey*, 70 Ohio St.3d at 356, quoting *Roszman v. Sammett*, 26 Ohio St.2d 94, 96-97, 269 N.E.2d 420 (1971) (combining discussion of wanton and reckless conduct and stating that ""'mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity"'"; *see also O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505*,* ¶73 (stating that "recklessness is a perverse disregard of a known risk").

3

## Negligence Distinguished

{¶ 48} In general, "negligence is defined as '[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation.'" *Cleveland Metro. Bar Assn. v. Berk*, 132 Ohio St.3d 82, 2012-Ohio-2167, 969 N.E.2d 256, ¶12, quoting Black's Law Dictionary 1133 (9th Ed.2009). Negligence involves "the absence of reasonable care." *Id.* "Negligence * * * * does not involve intent or a conscious purpose to do a wrongful act or to omit the performance of a duty." *Tighe*, 149 Ohio St. at 525–26 (citation omitted). Instead, negligent conduct "conveys the idea of inadvertence as distinguished from premeditated or formed intention." *Id.*

4

## Factors

{¶ 49} Courts have identified several factors that may be relevant when determining if a law enforcement officer operated a motor vehicle willfully, wantonly, recklessly, or simply negligently. The factors include the following: (1) the officer's speed; (2) whether the officer was traveling in the correct lane of travel; (3) whether the officer had the right-of-way; (4) the time of day; (5) the weather; (6) the officer's familiarity with the road; (7) the road contour and terrain; (8) whether traffic was light or heavy; (9) whether the officer made invasive maneuvers (i.e., attempting to force the vehicle from the road) or evasive maneuvers (i.e., attempting to avoid a collision); (10) the nature and seriousness of the offense that prompted the emergency; (11) whether the officer possessed a safer alternative; (12) whether the officer admitted to disregarding the consequences of his actions; (13) whether the officer activated the vehicle's

lights and sirens; and (14) whether the officer violated any applicable departmental policy. *E.g., Gates v. Leonbruno*, 2016-Ohio-5627, 70 N.E.3d 1110, ¶40 (8th Dist.); *Adams v. Ward*, 7th Dist. Mahoning No. 09MA25, 2010-Ohio-4851, ¶28; *accord Argabrite* (considering weather and traffic conditions, as well as speed, pursuit policy, and activation of police cruiser's lights and sirens). No one factor is determinative, however. *See Argabrite* at ¶16 and 21 (declining to adopt any per se rules and concluding that neither speed nor policy violation alone sufficient to demonstrate wanton or reckless conduct); *Gates* at ¶45 (noting that neither speed nor violation of departmental policy sufficient, on their own, to illustrate that officer operated vehicle in willful, wanton, or reckless manner). Instead, courts must consider the totality of the circumstances surrounding the pursuit. *Id.* at ¶41; *see Argabrite* (considering the totality of the circumstances surrounding the pursuit, instead of examining any one factor in isolation).

{¶ 50} Most recently, the Ohio Supreme Court in *Argabrite*[8] indicated that neither a high-speed police pursuit nor a violation of departmental policy equates to per se recklessness or demonstrates the existence of "a genuine issue of material fact concerning whether an officer has acted with a malicious purpose, in bad faith or in a wanton or reckless manner." *Id.* at ¶16 and 21. In *Argabrite*, the plaintiff, an innocent third-party, sustained injuries following a high-speed police chase that ended in a motor vehicle collision. The plaintiff subsequently filed a complaint against the law enforcement officers involved in the high-speed pursuit. The plaintiff asserted

---

[8] Although the Ohio Supreme Court decided this case before appellants appealed the trial court's judgment, neither appellees nor appellants cited it in their briefs. We granted the parties an opportunity to file supplemental briefs to address the applicability of *Argabrite* to the case sub judice.

    In their supplemental brief, appellees assert that *Argabrite* is factually distinguishable. While we agree that there are factual differences between the case sub judice and *Argabrite*, we do not believe that the court limited the rules set forth in its decision to the particular facts involved in *Argabrite*.

that the officers were not entitled to statutory immunity because their conduct was wanton or reckless. *Argabrite v. Neer*, 26 N.E.3d 879, 2015-Ohio-125 (2d. Dist), ¶2 *(Argabrite I)*. The plaintiff alleged that the officers acted wantonly or recklessly by engaging in a high-speed pursuit "through commercial and residential areas during heavy traffic when the suspect was not violent and could have been later apprehended with a warrant." *Id.* at ¶2. The plaintiff further claimed that the officers violated departmental policy during the pursuit. *Id.* at ¶22. The officers filed summary judgment motions and argued, in part, that they were entitled to immunity under R.C. 2744.03(A)(6)(b) because they did not act maliciously, in bad faith, wantonly, or recklessly. Both the trial and appellate courts applied a "no-proximate-cause rule" to determine that the officers were entitled to summary judgment and did not address the R.C. 2744.03(A)(6)(b) immunity issue.[9]

{¶ 51} On appeal to the Ohio Supreme Court, the court rejected the no-proximate-cause rule and instead determined that R.C. 2744.03(A)(6)(b) governs the immunity analysis. *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, ¶12 *(Argabrite* II). The court then independently reviewed whether the evidence created any issue of fact as to whether the law enforcement officers acted maliciously, in bad faith, wantonly, or recklessly.

{¶ 52} The court recognized that the evidence indicated that one of the officers violated

---

[9] The Second District Court of Appeals explained the no-proximate-cause rule as follows:

> This rule comes from the Ninth District's "no proximate cause" holding in *Lewis v. Bland*: "When a law enforcement officer pursues a fleeing violator and the violator injures a third party as a result of the chase, the officer's pursuit is not the proximate cause of those injuries unless the circumstances indicate extreme or outrageous conduct by the officer, as the possibility that the violator will injure a third party is too remote to create liability until the officer's conduct becomes extreme." 75 Ohio App.3d 453, 456, 599 N.E.2d 814 (9th Dist.1991).

*Argabrite I* at ¶5.

departmental policy in pursuing the suspect's vehicle. The court stated, however, that violating departmental policy "does not equate to per se recklessness." *Id.* at ¶21. Instead, the evidence must also show that the officer knows that violating the departmental policy at issue "'will in all probability result in injury.'" *Id.* at ¶21, quoting *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, paragraph three of the syllabus. The court explained that if the evidence fails to show that the officer knows that violating the departmental policy at issue "'will in all probability result in injury,'" then "evidence of a policy violation demonstrates negligence, at best." *Id.*

{¶ 53} The court additionally observed that the pursuing officers followed the suspect during light traffic and sunny weather conditions and that they had activated their overhead lights and sirens throughout the pursuit. Furthermore, the evidence showed that the officers' rate of speed varied from 45 to 80 miles per hour in zones with speed limits ranging from 25 to 55 miles per hour. *Argabrite I* at ¶23. The court concluded that the foregoing evidence failed to support any finding that the officers engaged in wanton or reckless conduct. *Argabrite II* at ¶30. The court thus determined that the officers were statutorily immune from liability under R.C. 2744.03(A)(6)(b). *Id.* at ¶30.

{¶ 54} In *Gates v. Leonbruno*, 70 N.E.3d 1110, 2016-Ohio-5627 (8th Dist.), the court determined that the trial court erred by concluding that genuine issues of material fact remained regarding whether a law enforcement officer wantonly or recklessly pursued a vehicle for a traffic violation. In *Gates*, the officer observed the subject vehicle traveling at least 82 miles per hour along a highway with a speed limit of 60 miles per hour. The officer started following the vehicle. During the ensuing pursuit, both the officer and the subject reached speeds over 100

miles per hour. While along the highway, the officer traveled between 80 to 150 miles per hour in an effort to catch up to the subject vehicle. After approximately 110 seconds, the pursuit ended with the subject vehicle crashing and severely injuring a passenger. After the trial court denied the officer's summary judgment motion on the basis of statutory immunity, the officer appealed.

{¶ 55} The court of appeals reversed the trial court's decision and determined that no reasonable factfinder could conclude that the officer operated his vehicle in a wanton and reckless manner. *Id.* at ¶41. In reaching its decision, the court did not consider any particular aspect of the officer's conduct in isolation, but instead, looked at the totality of the circumstances. *Id.* at ¶40-42. The court concluded that the following circumstances showed that the officer's conduct was not wanton or reckless: (1) during the pursuit, the officer activated his lights and sirens; (2) the traffic was light and the road was well-lit; (3) the pursuit lasted less than two minutes; and (4) the officer did not follow the subject vehicle too closely but remained 800 to 1000 feet behind it "for all but the last few seconds." *Id.* at ¶43.

{¶ 56} The court thus disagreed with the trial court's conclusion that the officer's decision to pursue the vehicle late at night, through two jurisdictions, at a high rate-of-speed, and in purported violation of departmental policy created genuine issues of material fact as to whether the officer wantonly or recklessly operated his motor vehicle. *Id.* at ¶41. While the court found the high rate-of-speed "concerning," it declined to adopt a bright-line rule that a law enforcement officer who travels at a high rate of speed engages in wanton or reckless behavior. *Id.* at ¶45-46.

{¶ 57} In *Smith v. McBride*, 10th Dist. Franklin No. 09AP-571, 2010-Ohio-1222, 2010

WL 1138977, aff'd, 130 Ohio St.3d 51, 2011-Ohio-4674, 955 N.E.2d 954, the appellate court affirmed the trial court's decision entering summary judgment in favor of a political subdivision and its law enforcement officer.[10] The plaintiff alleged that the officer willfully, wantonly, and recklessly operated his motor vehicle when responding to an emergency call by driving at excessive speeds at night and by failing to use evasive maneuvers. The plaintiff additionally asserted that the officer's speed caused him to have a reduced reaction time and that he had an obstructed view of the intersection where the collision occurred. The court of appeals concluded that the following circumstances failed to create a genuine issue of material fact as to whether the officer willfully, wantonly, or recklessly operated his cruiser: (1) the officer was responding to an emergency call; (2) the accident occurred on a "flat stretch of road" that consisted of seven lanes; (3) traffic conditions were light; (4) there was no evidence of adverse weather conditions; (5) it was night-time; (6) the officer was traveling between 55 and 58 mph in a 45 mph zone; (7) the officer did not activate his lights and sirens, but his headlights were illuminated; (8) the officer had the right-of-way; and (9) the officer removed his foot from the accelerator when he noticed a car turning in front of him. *Id.* at ¶30-31 and ¶35. The court additionally noted that the record did not contain any evidence that the plaintiff "was deprived of an opportunity to yield" to the officer's vehicle. *Id.* at ¶30.

{¶ 58} In *Adams v. Ward*, 7th Dist. Mahoning No. 09MA25, 2010-Ohio-4851, the court affirmed the trial court's decision entering summary judgment in favor of the political

---

[10] In affirming the Ninth District Court of Appeals, the Ohio Supreme Court did not address the appellate court's conclusion that the evidence failed to support any finding that the officer acted wantonly or recklessly. Instead, the only issue the Supreme Court considered was whether the officer was responding to an emergency call. *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, 955 N.E.2d 954, ¶1, 11, and 19.

subdivision and a law enforcement officer. In *Adams*, the officer's cruiser collided with the plaintiff's vehicle after the officer drove through a red light at an intersection. The plaintiff asserted that the officer wantonly, willfully, and recklessly operated his cruiser. The court of appeals disagreed. The court found that the following facts were not sufficient to establish that the officer operated his vehicle in a willful, wanton, or reckless manner: (1) the officer was leading a car chase of a suspected felon; (2) the officer activated his lights and siren; (3) the officer was traveling approximately 45 miles per hour, which exceeded the posted speed limit of 35 miles per hour; (4) the officer slowed down before driving through the red light; (5) the officer was familiar with the intersection; (6) the officer looked for cross-traffic as he approached the intersection, but his view was slightly obstructed in one direction; (8) the officer did not see anything that warranted coming to an abrupt stop; (9) before the intersection, the road curved and had an elevation; (10) the officer did not drive left-of-center; (11) the officer believed that he complied with the departmental pursuit policy, even though he did not, in fact, comply with it;[11] (12) the officer did not have a safer alternative; (13) the officer stated that he weighed the possible risks and did not disregard the consequences; and (14) the officer believed that the fleeing individual posed "a significant risk to the public safety." *Id.* at ¶29, ¶31 and ¶35. The court did not believe that the officer took "an unreasonable risk" by driving through the red light at an intersection, even though "there was an undisputed element of diminished visibility" and he did not follow the pursuit policy. *Id.* at ¶40. The court explained that the officer "was traveling at most 10 mph over the speed limit, his lights and sirens were activated, he was familiar with the

---

[11] The pursuit policy stated that an "officer cannot race through an intersection," but instead, must "slow to 25 mph when going through the intersection." *Id.* at ¶38.

road, he slowed through the intersection, he attempted to assure that he had clear passage, [and] it was during the daylight hours of a clear, dry day." *Id.* at ¶40. The court thus found that the officer was entitled to immunity as a matter of law. *Id.* at ¶40.

{¶ 59} In *Bricker v. State Farm Ins*., 11th Dist. Lake No. 2009-L-087, the court reversed the trial court's decision that denied a political subdivision and its law enforcement officer summary judgment. The appellate court determined that the trial court incorrectly concluded that genuine issues of material fact remained as to whether the officer's conduct was willful, wanton, or reckless. In *Bricker*, the officer's patrol car collided with an innocent third-party's vehicle as the officer was responding to a call of an intruder located in a home. While the officer was en route to the home, traffic was light and the pavement was wet. The officer activated the patrol car's lights and siren. As the officer approached an intersection with a red light, he decelerated his car and visually inspected the intersection to look for cross-traffic or pedestrians. The officer did not notice any vehicles approaching. Once in the intersection, he saw the plaintiff's vehicle and fully braked, but was unable to avoid a collision. The data recorder from the officer's car indicated that five seconds before the accident, the officer was traveling approximately 65 miles per hour. Between seconds five and four, the officer removed his foot from the accelerator and slowed to 62 miles per hour. He continued slowing, and at the time of impact, he was traveling approximately 19 miles per hour.

{¶ 60} The court of appeals observed that the officer presented evidence showing that "(1) he employed both his lights and siren as he approached the intersection; (2) he was traveling in his proper lane of travel; (3) he had 'cleared' the intersection sufficiently to establish he could enter the intersection; and (4) he began to brake as he approached, slowing considerably over a

five-second span." *Id.* at ¶48. The court concluded that the officer satisfied his burden to show the absence of a genuine issue of material fact, and that the plaintiffs failed to present any evidence that would tend to show that the officer's conduct was willful, wanton, or reckless. *Id.* at ¶49. The court pointed out that the plaintiffs did not present any evidence that the officer's conduct "failed to meet accepted or written standards." *Id.* at ¶46. The court thus determined that without a "verifiable standard [by] which to judge" the officer's conduct, it could not conclude that the officer acted willfully, wantonly, or recklessly. *Id.* at ¶49. The court concluded that the plaintiffs therefore failed to show the existence of a genuine issue of material fact as to the political subdivision's and the officer's immunity. *Id.* at ¶57.

{¶ 61} In *Byrd v. Kirby*, 10th Dist. Franklin No. 04AP-451, 2005-Ohio-1261, the court affirmed the trial court's decision that entered summary judgment in favor of a political subdivision and its law enforcement officer. In *Byrd*, the plaintiffs alleged that the officer willfully, wantonly, and recklessly drove his police cruiser through a red light at a high rate of speed and crashed into the plaintiffs' vehicle. *Id.* at ¶4. Before the collision, the officer and his partner were on routine patrol when they received an "officer in trouble" call over the radio. *Id.* at ¶11. The officer activated the cruiser's lights and sirens and drove towards the officer in trouble. *Id.* As the cruiser approached a red light at an intersection, the officer slowed to ensure opposing traffic stopped and yielded to his lights and siren. *Id.* The officer was traveling 40 to 46 miles per hour as he entered the intersection. *Id.* The plaintiffs' "vehicle suddenly appeared traveling westbound across [the officer]'s path." *Id.* The officer "braked hard," but was unable to avoid hitting the plaintiffs' vehicle. *Id.* At the time of the accident, the weather was clear, the road was dry, and traffic was light. *Id.* After the accident, the driver

of the plaintiffs' vehicle was issued a citation for failing to yield to a public safety vehicle. *Id.* at ¶17.

**{¶ 62}** The appellate court concluded that the evidence failed to create a genuine issue of material fact as to whether the officer acted willfully, wantonly, or recklessly. The court noted that none of the evidence indicated that the officer acted with intent or purpose so as to constitute willfulness. *Id.* at ¶22. The appellate court determined that the evidence shows that the officer exercised at least some degree of care and hence did not act wantonly. *Id.* at ¶¶25-26. The court observed that the officer exercised some care by activating his lights and sirens, looking for cross-traffic, and slowing the vehicle while approaching the red light at the intersection. *Id.* at ¶26. The court additionally concluded that the officer's conduct was not reckless. *Id.* at ¶28. The court explained:

> Police runs in response to emergencies inevitably entail some degree of risk both to the responding officer and affected traffic. Nonetheless, Ohio law provides that vehicles on such emergency runs may, with lights activated and with due regard for the safety of others, exceed the posted speed limit (R.C. 4511.24) and proceed through red lights or stop signals (R.C. 4511.03). Because the law and current police and emergency practice clearly contemplate the necessity in some circumstances of such emergency runs, a responding officer does not create an 'unreasonable' risk of harm by engaging in an emergency run merely because such a response creates a greater risk than would be incurred by traveling at normal speed and in compliance with opposing traffic signals. The question of unreasonable risks must be weighed in terms of what is acceptable in the context of an emergency run, not ordinary driving conditions; * * *.

*Id.*

**{¶ 63}** The court thus determined that no reasonable factfinder could conclude that the officer was reckless. *Id.* at ¶29. The court therefore concluded that the plaintiffs failed to establish the existence of a genuine issue of material fact concerning the political subdivision's

and the officer's immunity.

{¶ 64} In *Elsass v. Crockett*, 9th Dist. Summit No. 22282, 2005-Ohio-2142, 2005 WL 1026700, the court of appeals affirmed the trial court's decision that determined no genuine issues of material fact remained as to whether a law enforcement officer willfully, wantonly, or recklessly operated his motor vehicle. In *Elsass*, the injured driver was attempting to make a u-turn in the middle of a four-lane roadway when the officer's police cruiser crashed into it. The plaintiffs alleged that the officer acted recklessly by failing to activate the cruiser's lights and siren, by failing to illuminate his headlights, by violating departmental policy, and by speeding. They further claimed that the officer acted recklessly because he lacked sufficient training and experience in operating a police car without supervision.

{¶ 65} The appellate court determined that the plaintiffs did not establish the existence of a genuine issue of material fact as to whether the officer acted recklessly. The court noted that the record did not contain any evidence to show that the officer failed to illuminate his headlights. The court also determined that even if the officer violated departmental policy, any violation does not equate with a finding of recklessness. The court explained:

> The facts presented demonstrate that [the officer] was on an emergency call, where someone had been stabbed and the suspect was still in the area, so that time was of the essence. [The officer] was exceeding the speed limit and not using his siren or overhead lights in violation of statute and police department guidelines, but he was doing so in the good faith belief that his actions were necessary and that he had discretion to proceed in such a manner. [The officer] used his headlights and attempted to pass [the plaintiff's] vehicle in the appropriate lane. While [the officer's] actions may have risen to the level of negligence, there was nothing to indicate that a reasonable person would have believed that such conduct created an unnecessary risk of physical harm under the circumstances.

*Id.* at ¶33.

**{¶ 66}** The court further discounted the plaintiffs' claim that the officer acted recklessly due to his lack of adequate training and experience. The court noted that the officer graduated from the police academy and worked with a supervisor for six months. The court additionally observed that the officer had been on the force for less than two years. The court determined, however, that being on the force for less than two years did not create a genuine issue of material fact as to whether the officer recklessly operated his police cruiser.

**{¶ 67}** The court further determined that the evidence failed to show that the officer acted willfully or wantonly, so as to impose liability upon the political subdivision. In determining that the officer did not act wantonly, the court found that the record did not contain any evidence to show that the officer knew that failing to activate his lights and siren and exceeding the posted speed limit presented a great probability of harm to the plaintiff. *Id.* at ¶42. The court cited the following circumstances to support its conclusion: (1) the traffic "was very limited" around the time of the accident; (2) the area was well-lit; (3) the weather was clear; (4) the officer was not driving at a "very high rate of speed," but instead, was driving around 45 miles per hour; (5) "[t]ime was of the essence in responding to an emergency where someone had been stabbed and the suspect was still in the area"; (6) the officer was driving in the passing lane of the street; and (7) the accident occurred when the driver made a u-turn into the officer's path. *Id.*

**{¶ 68}** For similar reasons, the court additionally determined that the officer did not act willfully. The court explained: "in consideration of the limited traffic and clear visibility at the time, as well as a driver's reasonable expectation to be able to drive in a passing lane unimpeded by curb-lane traffic making u-turns, there is no evidence to indicate that [the officer] could reasonably know or appreciate any likelihood of the resulting injury." *Id.* at ¶43. The court

thus concluded that both the officer and the political subdivision were immune from liability.

{¶ 69} In *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 2002-Ohio-222, 772 N.E.2d 129 (9th Dist.), the court determined that the political subdivision and the officer were immune from liability. In that case, the officer decided to initiate a traffic stop after he observed a vehicle swerve left of the centerline and learned that the registered owner of the vehicle had an outstanding arrest warrant. After the driver of the vehicle failed to stop, the officer activated his lights and siren and pursued the vehicle. The pursuit continued for approximately eleven minutes, at speeds in excess of 85 miles per hour. The subject vehicle subsequently crashed into the plaintiff's vehicle.

{¶ 70} The plaintiff asserted that the officer willfully, wantonly, and recklessly operated his vehicle. The plaintiff argued that the officer should not have initiated the pursuit due to the inherent danger police pursuits present to the public. The plaintiff contended that the officer failed to balance the seriousness of the offense for which he began the pursuit against the danger to the public. *Id.* at ¶38.

{¶ 71} The court disagreed with the plaintiff and determined that the officer did not act recklessly. *Id.* at ¶40. The court observed that the officer did not contest that pursuing the vehicle endangered the public and he also did not contest that he was aware of the general danger throughout the pursuit. The court determined, however, that "the fact that danger inheres in high-speed chases alone is not sufficient to present a genuine issue of fact concerning whether [the officer] acted with malicious purpose, in bad faith, or in a wanton or reckless manner." *Id.*

{¶ 72} The appellate court additionally concluded that the evidence failed to suggest that the officer operated his vehicle in a willful or wanton manner and referred to the following

evidence to support its conclusion: (1) the pursuit began around 1:20 a.m. and occurred primarily outside the city limits; (2) the officer activated his lights and sirens; (3) before the collision, the officer had encountered only one or two other vehicles; (4) the officer slowed when he encountered stop signs and railroad crossings; (5) the officer followed the subject vehicle at a distance of approximately one-quarter mile; and (6) the officer reached top speeds of 80-90 miles per hour and was traveling approximately 50 miles per hour at the time of the accident. *Id.* at ¶29.

{¶ 73} The court also recognized that the plaintiff's experts testified that the officer violated departmental policy, that the officer failed to exercise any care for the public during the pursuit, and that the officer engaged in wanton, reckless, extreme, and outrageous conduct. *Id.* at ¶41. The court concluded, however, that the experts' opinions did not create any factual issues, but instead, merely stated legal conclusions. *Id.* The court thus determined that reasonable minds could only conclude that the officer did not act with malicious purpose, in bad faith, or in a wanton or reckless manner. *Id.* at ¶42. The court therefore concluded that the political subdivision and the officer were entitled to immunity.

{¶ 74} In contrast to the foregoing cases, in *Hardesty v. Alcantara*, 48 N.E.3d 127, 2015-Ohio-4591 (8th Dist.), the court determined that a reasonable factfinder could conclude that a law enforcement officer acted wantonly or recklessly. In *Hardesty*, the officer decided to stop a vehicle after observing what he believed to be a drug transaction occurring between a person standing outside the vehicle and its occupants, and after learning that the license plate of the vehicle was registered to an individual with an outstanding felony warrant for domestic violence. The court determined that the following facts created genuine issues of material fact as to

whether the officer wantonly or recklessly operated his motor vehicle: (1) during the pursuit, the officer traveled in excess of 100 miles per hour; (2) the posted speed limit was 35 miles per hour; (3) traffic was heavy traffic and it was rush hour; (4) the officer did not continuously run his siren; (5) the officer may have been following the vehicle too closely; (6) the officer violated several departmental policies; and (7) the officer was disciplined for failing to terminate the pursuit. *Id.* at ¶37, ¶38, ¶40, ¶43, ¶46.

{¶ 75} In *Thompson v. Smith*, 178 Ohio App.3d 656, 2008-Ohio-5532, 899 N.E.2d 1040 (11th Dist.), the court determined that genuine issues of material fact remained as to whether the officer willfully, wantonly, or recklessly operated his police cruiser. In *Thompson*, the officer struck and killed a pedestrian as she attempted to cross the street. The evidence indicated that before the accident, the officer most likely had been traveling anywhere between 59 and 66 miles per hour on a roadway with a posted speed limit of 35 miles per hour. Additionally, the officer had not activated his lights and sirens. The appellate court determined that the officer's speed, combined with his failure to activate his lights and sirens, created a genuine issue of material fact as to whether he acted willfully, wantonly, or recklessly. *Id.* at ¶46 and ¶67.

{¶ 76} In *Wagner v. Heavlin*, 136 Ohio App.3d 719, 737 N.E.2d 989 (7th Dist. 2000), the court found that genuine issues of material fact remained as to whether the officer's conduct was willful, wanton, or reckless. In *Wagner*, the officer ran over and killed the driver of a motorcycle he had been pursuing. The officer and the political subdivision asserted that the following facts established that the officer did not operate his vehicle in a willful or wanton manner: (1) the officer maintained a distance of six to twelve car-lengths between his vehicle and the pursued vehicle; (2) the officer activated the vehicle's lights and siren; (3) the officer used his

loudspeaker to warn the driver to stop; (4) the officer was only traveling five to ten miles over the speed limit; (5) traffic was light; and (6) the roadway was dry and clear. *Id.* at 732. The appellate court disagreed and instead concluded that the following evidence created genuine issues of material fact: (1) the officer decided to pursue the motorcycle because he suspected that the motorcyclist's driving privileges had not been reinstated; (2) the officer could have obtained an arrest warrant for the motorcyclist instead of pursuing him; (3) the officer may have traveled over 100 miles per hour during the pursuit; (4) the officer was unfamiliar with the roadway; (5) the pursuit occurred during the nighttime; (6) the officer may not have maintained a safe distance between his vehicle and the motorcycle; and (7) the officer admitted that he disregarded the consequences of his actions. *Id.* at 732-733. The court determined that the foregoing evidence also created a genuine issue of material fact as to whether the officer recklessly operated his vehicle. *Id.* at 737-738.

5

Application

**{¶ 77}** In the case at bar, appellants argue that the evidence does not allow reasonable minds to conclude that Deputy Johnson willfully, wantonly, or recklessly operated his motor vehicle. Appellant assert that the following collection of facts fail to demonstrate willful, wanton, or reckless conduct: (1) Deputy Johnson was traveling in his own lane of travel; (2) Trooper Hoffman's vehicle unpredictably and unforeseeably backed up in Deputy Johnson's lane of travel and blocked Deputy Johnson's lane of travel; (3) the weather was clear and dry; (4) traffic was light; (5) Deputy Johnson activated his lights and sirens; (6) the section of the road where the accident occurred did not contain a traffic control device for traffic traveling on

Jackson Pike, as Deputy Johnson was; (7) Deputy Johnson was responding to a fellow officer's call for help, which necessitated a rapid response; (8) Deputy Johnson applied his brakes and attempted to swerve in order to avoid colliding with Trooper Hoffman's cruiser; and (9) Deputy Johnson did not violate departmental policy. Appellants recognize that Deputy Johnson was traveling at a high rate of speed, but argue that speed alone does not sufficiently show that a law enforcement officer willfully, wantonly, or recklessly operated a motor vehicle.

{¶ 78} Appellees contend that the following circumstances create genuine issues of material fact as to whether Deputy Johnson willfully, wantonly, and recklessly operated his vehicle: (1) he was traveling over 100 miles per hour; (2) he did not know how fast he was driving; (3) he drove left of the center line; (4) the roadway contained a hill and a curve, which limited Deputy Johnson's visibility of potential traffic in front of him; (5) he was driving over 100 miles per hour while approaching an intersection; (6) he did not know the location of Left Fork Road; (7) he did not have adequate training and experience to be able to control a vehicle traveling over 100 miles per hour; (8) he received a reprimand following the accident; and (9) he did not drive with due regard to the safety of other vehicles traveling upon the roadway.

{¶ 79} As we explain below, we do not believe that reasonable minds could conclude that Deputy Johnson willfully, wantonly, or recklessly operated his motor vehicle. Appellees have not satisfied the "rigorous" requirement to show that Deputy Johnson acted willfully, wantonly, or recklessly. *Argabrite* at ¶8. Thus, they failed to meet their "onerous" burden to establish that the political subdivision and Deputy Johnson are not immune from liability. *Id.* at ¶31.

Willful

{¶ 80} In the case sub judice, we believe that the evidence fails to lead to any reasonable conclusion or inference that Deputy Johnson intentionally deviated from a clear duty or from a definite rule of conduct, that he possessed a deliberate purpose not to discharge some duty necessary to safety, or that he purposefully performed a wrongful act with knowledge or appreciation of the likelihood of resulting injury.  *Anderson* at ¶32.

{¶ 81} We first note that appellees have not set forth a clear duty or definite rule of conduct from which Johnson deviated.  Appellees presented evidence showing that a law enforcement officer has a duty to operate his motor vehicle with due regard for safety.  The standard of "due regard for safety" does not clearly or definitively define a precise duty or conduct, however.  Rather, it appears to be a flexible concept so that an officer possesses discretion in determining how to respond to calls for help.  Indeed, the deposition testimony establishes that law enforcement officers are afforded discretion to determine how to respond to emergency calls.  Trooper Fellure explained that the standard means that emergency responders are "not going to go a hundred miles an hour through a red light," but he further stated that there are "no set rule[s]."  Additionally, Trooper Hoffman stated that law enforcement officers have discretion when determining how to respond to an emergency situation.  Trooper Hoffman stated that "there's no way that they can make a hard [and] fast rule that this is what you're going to do."  Gallia County Sheriff Joseph R. Browning likewise stated that officers have discretion when determining how to respond to an emergency call.

{¶ 82} Furthermore, even though Deputy Johnson intentionally deviated from the speed limit, law enforcement officers are permitted to exceed the speed limit.  R.C. 4511.24 (stating

that speed limitations do not apply to emergency or public service vehicles responding to an emergency).   We observe that the evidence shows that Trooper Hoffman drove in excess of 100 miles per hour in response to Trooper Fellure's call for assistance.[12]   Moreover, Trooper Hoffman testified that he routinely exceeded the speed limit and often traveled over 100 miles per hour.   Thus, Trooper Hoffman's testimony shows that no definite rule of conduct prohibited Johnson from traveling over 100 miles per hour in order to assist a fellow officer.   Additionally, the record contains no evidence to show that Deputy Johnson violated an established policy by driving 100 miles per hour.   Thus, the evidence fails to show that Deputy Johnson intentionally deviated from a clear duty or from a definite rule of conduct.

{¶ 83} For similar reasons, the evidence does not suggest that Deputy Johnson possessed a deliberate purpose not to discharge some duty necessary to safety or that he purposefully did a wrongful act.   While obeying the speed limit may be a duty necessary to safety for the ordinary motorist, law enforcement officers are permitted to exceed the speed limit.   R.C. 4511.24; *Byrd*; *see Baum v. Ohio State Hwy. Patrol*, 72 Ohio St.3d 469, 471, 650 N.E.2d 1347 (1995) (noting that law enforcement officers are permitted to take greater risks than private citizens and that an officer's "liability cannot be determined by 'the same rules of law applicable to suits between private parties'").   Thus, Deputy Johnson was permitted to exceed the speed limit.   Moreover, although the ordinary motorist might commit a wrongful act by exceeding the speed limit, we

---

[12] We point out that the parties presented conflicting evidence concerning Deputy Johnson's speed.   The Ohio State Highway Patrol crash investigator estimated Deputy Johnson's speed to be between 65 and 72 miles per hour at the point of impact, with a top speed of 97 miles per hour.   Appellees' expert, however, believed Deputy Johnson's top speed ranged from 100 to 106 miles per hour.   For purposes of summary judgment, we must construe that evidence most strongly in appellees' favor.   We must therefore construe the evidence to be that Deputy Johnson's top speed ranged from 100 to 106 miles per hour.

again note that law enforcement officers are permitted to exceed the speed limit. Thus, an officer who exceeds the speed limit does not necessarily commit a wrongful act. The evidence in the case at bar fails to show that Deputy Johnson intended to commit a wrongful act by failing to obey the speed limit. Instead, he believed that exceeding the speed limit was an appropriate response to Trooper Fellure's call for help. He thus did not intend to commit a wrongful act.

{¶ 84} Consequently, reasonable minds could only conclude that Deputy Johnson did not operate the vehicle in a willful manner.

<u>Wanton</u>

{¶ 85} We likewise do not believe that the evidence leads to any reasonable conclusion that Deputy Johnson acted wantonly. The evidence, construed most strongly in appellees' favor, shows the following: (1) at the time of the accident, the weather was cloudy and dry, traffic was light, and it was daylight; (2) the accident occurred on Jackson Pike, on a rural section of the road; (3) driveways and other roadways lined Jackson Pike; (3) Deputy Johnson was familiar with the road upon which the accident occurred but was not entirely certain where the turn for Left Fork Road was located; (3) approximately 1100 feet from the crash site, the road was elevated with a slight curve; (4) once he topped the hill, Deputy Johnson had 1100 feet of visibility to the crash site; (5) Deputy Johnson traveled between 100 and 106 miles per hour while en route to Trooper Fellure's location on a roadway with a posted speed limit of 55 miles per hour; (6) Deputy Johnson activated his vehicle's lights and sirens; (7) Deputy Johnson was traveling in his own lane when he noticed Trooper Hoffman's vehicle backing up in his lane of travel; (8) Deputy Johnson braked and swerved to the left of the center line in an attempt to avoid a collision; (9) Deputy Johnson was traveling between 65 and 74 miles per hour at the time of

impact; (10) Deputy Johnson did not admit to disregarding the consequences of his actions, but he did admit, three years after the accident, that he was unsure how fast he was traveling; (11) the evidence is unclear whether Deputy Johnson violated departmental policy, but following the accident, the sheriff "cautioned [Deputy Johnson] in the future to drive with due care" and requested that he complete a driving course; (12) Deputy Johnson completed the six-month police academy training in 2007; and (11) Deputy Johnson has been employed as a part-time deputy since 2007.

{¶ 86} The foregoing facts do not suggest a complete absence of care. Deputy Johnson exercised some care by activating his lights and sirens when he responded to Trooper Fellure's call for help, by applying his brakes when he noticed Trooper Hoffman's vehicle blocking Deputy Johnson's lane of travel, and by swerving in an attempt to avoid a collision. *See Argabrite* at ¶29 (noting that officer activated lights and sirens); *Gates* at ¶43 (same); *Smith* at ¶30 (observing that officer removed foot from accelerator prior to impact); *Adams* at ¶39 (recognizing that officer activated lights and sirens); *Bricker* at ¶48 (pointing out that officer activated lights and sirens and braked in attempt to avoid collision); *Byrd* at ¶26 (same); *Shalkhauser* at ¶29 (noting that officer activated lights and sirens). While Deputy Johnson may have been traveling at a high rate of speed, he stated that he did not believe he was traveling too fast for the road conditions and that he was familiar with the road–including the slight curve or bend and the hill. *See Adams* at ¶29 (observing that officer stated he was familiar with road). Deputy Johnson's testimony therefore implies that he gave at least some conscious thought to his speed while he was driving, that he did not believe he was driving in an unsafe manner, and that he did not exhibit an entire absence of care. We also note that recently the Ohio Supreme Court

explicitly indicated that high-speed alone does not sufficiently demonstrate wantonness. *Argabrite* at ¶16.

{¶ 87} Additionally, Deputy Johnson was not following Trooper Hoffman's vehicle too closely. Instead, the evidence plainly shows that Deputy Johnson lost sight of Trooper Hoffman's vehicle and that he had approximately 1100 feet of distance between his vehicle and Trooper Hoffman's vehicle when he crested the hill shortly before the accident. *See Gates* at ¶43 (pointing out that officer did not follow vehicle too closely); *Shalkhauser* at ¶29 (same).

{¶ 88} Furthermore, the evidence does not indicate Deputy Johnson knew that driving over 100 miles per hour presented a great probability of harm under the circumstances. At the time of the accident, it was still daylight, the roadway was clear, traffic was light, and the weather was dry. *See Argabrite*; *Gates*; *Smith*; *Adams*; *Bricker*; *Byrd*; *Elsass*; *Shalkhauser*. Deputy Johnson stated that he did not believe he was traveling too fast for the road conditions and that he was familiar with the road on which the accident occurred. Deputy Johnson may not have known the exact location where he needed to turn onto Left Fork Road, but he stated that he had a general idea of where the road was located. Deputy Johnson had not been following Trooper Hoffman too closely. Deputy Johnson had no reason to know that Trooper Hoffman's vehicle would be backing up in Deputy Johnson's lane of travel. Furthermore, even if Deputy Johnson has not undergone the same training as Trooper Hoffman, the record does not contain any evidence that Deputy Johnson was so inadequately trained that he knew he would be unable to control his motor vehicle at a speed over 100 miles per hour. *See Jackson v. Poland Tp.*, 7th Dist. Mahoning Nos. 96CA261, 97CA13, and 98CA105, 1999-Ohio-998, 1999 WL 783959, *7 (holding that an officer's lack of experience of training "does not bear any relevance to the

determination of whether" the officer willfully or wantonly operated the vehicle at the time of the accident); *see also Elsass* at ¶¶27-28 (rejecting argument that officer acted recklessly due to alleged lack of adequate training and experience). Instead, the record indicates the opposite: Deputy Johnson stated that he did not believe he was traveling too fast.

{¶ 89} We recognize appellees' argument that Deputy Johnson's statement that he did not know how fast he was traveling shows that he did not exercise any care. We do not believe, however, that Deputy Johnson's failure to look at his speedometer to determine his speed shows an absence of care. Even though Deputy Johnson may not know the precise speed at which he was traveling, he explained that he did not believe he was traveling too fast given the road conditions and circumstances. Under the circumstances present in the case at bar, we cannot equate a failure to look at the speedometer with a failure to exercise any care. Consequently, we do not believe that reasonable minds could conclude that Deputy Johnson acted wantonly when responding to Trooper Fellure's call for help.

Reckless

{¶ 90} Additionally, the evidence does not allow reasonable minds to conclude that Deputy Johnson was reckless. Assuming, arguendo, that Johnson consciously disregarded a known risk of harm to another, we cannot conclude that the risk of harm was unreasonable under the circumstances and substantially greater than negligent conduct. Admittedly, Deputy Johnson's speed posed a risk of harm to others. The risk of harm, however, was not unreasonable under the circumstances. Deputy Johnson exceeded the speed limit because he believed a fellow officer needed assistance with multiple individuals who had been involved in a domestic violence situation. We are unable to conclude that an officer who exceeds the speed

limit in order to assist a fellow officer necessarily creates an unreasonable risk of harm. *See Byrd* at ¶28 (noting that "question of unreasonable risks must be weighed in terms of what is acceptable in the context of an emergency run, not ordinary driving conditions"). Furthermore, we note that the *Argabrite* court explicitly stated that traveling at a high rate-of-speed does not show recklessness. *Id.* at ¶16.

{¶ 91} Additionally, even if Deputy Johnson violated departmental policy, a violation of departmental policy does not equate to per se recklessness. *Id.* at ¶21. Instead, the officer must be conscious that violating departmental policy will in all probability result in injury. *Id.* "Without evidence of that knowledge, evidence of a policy violation demonstrates negligence, at best." *Id.* As we have already explained, the evidence does not show that Deputy Johnson knew that exceeding the speed limit would in all probability result in injury. While perhaps Deputy Johnson was or should have been aware that his conduct might result in harm, proving that he recklessly disregarded a known or obvious risk of harm to another requires appellees to show more than a mere possibility of injury. *See O'Toole*, 118 Ohio St.3d at 74 (stating that "[r]ecklessness * * * requires something more than mere negligence).

{¶ 92} Moreover, we do not agree with appellees that Deputy Johnson's training and experience was so inadequate that his decision to drive over 100 miles per hour created an unreasonable risk of harm. Even if Deputy Johnson did not complete the same driving courses as Trooper Hoffman, nothing in the record shows that the training and he experience he did receive was inadequate. The undisputed evidence shows that he completed his training at the police training academy and worked under supervision after he graduated. Additionally, although appellees claim that Deputy Johnson lacks sufficient experience as a law enforcement

officer to be able to drive at speeds over 100 miles per hour, we are unaware of any rule that requires a law enforcement officer to be employed for a certain length of time before the officer may exceed the speed limit.

{¶ 93} While we recognize that appellees' expert opined that Deputy Johnson acted recklessly, the expert's opinion constitutes a legal conclusion and is insufficient to create a genuine issue of material fact. *See Shalkhauser* at ¶41. We further note that the expert based his standard of recklessness as applied to an ordinary motorist, not as applied to a law enforcement officer responding to an emergency call. *See Baum*, 72 Ohio St.3d at 471. The expert explained the basis for his opinion as follows: "One of the things I kind of apply is even on my most liberal analysis, if I were to stop somebody, when I was still a policeman, for a speed that I'm looking at, would I consider giving them a warning? No. You're not getting a warning for going 100 miles an hour in a 55 zone approaching an intersection." Moreover, while the expert indicates that Deputy Hoffman was approaching "an intersection," the record does not contain any evidence that the intersection with Left Fork Road contained a traffic control device that required traffic traveling on Jackson Pike, as Deputy Johnson was, to stop. *See* R.C. 4511.01(KK) ("'Intersection' means: (1) The area embraced within the prolongation or connection of the lateral curb lines, or, if none, the lateral boundary lines of the roadways of two highways that join one another at, or approximately at, right angles, or the area within which vehicles traveling upon different highways that join at any other angle might come into conflict. The junction of an alley or driveway with a roadway or highway does not constitute an intersection unless the roadway or highway at the junction is controlled by a traffic control device.").

{¶ 94} In sum, we believe that the case at bar is more similar to those cases in which the courts concluded that the officer did not willfully, wantonly, or recklessly operate his motor vehicle (*Argabrite*, *Gates*, *Smith*, *Adams*, *Bricker*, *Byrd*, *Elsass*, and *Shalkhauser*) than to those cases in which the courts determined that genuine issues of material fact remain regarding the officer's level of culpability (*Hardesty*, *Thompson*, and *Wagner*). Unlike *Hardesty*, in the case at bar, the evidence fails to indicate that Deputy Johnson drove over 100 miles per hour on a roadway with a posted speed limit of 35 miles per hour, during heavy traffic and during rush hour; and that he failed to activate his siren or to maintain a safe distance between his car and Trooper Hoffman's vehicle. Instead, Deputy Johnson drove over 100 miles per hour on a rural stretch of road with a posted speed limit of 55 miles per hour during light traffic; and he activated his lights and sirens and did not follow Trooper Hoffman too closely. Furthermore, unlike the officer in *Thompson*, Deputy Johnson activated his lights and sirens. Additionally, unlike the officer in *Wagner*, Deputy Johnson was familiar with the road upon which the accident occurred, he maintained a safe distance, and he did not admit to disregarding the consequences of his actions. Moreover, in *Wagner*, the officer pursued a motorcyclist at speeds over 100 miles per hour for a relatively minor traffic infraction (alleged driving under suspension). In the case sub judice, however, Deputy Johnson traveled at speeds over 100 miles per hour based upon his belief that a fellow officer needed help containing multiple suspects involved in a domestic violence situation.

{¶ 95} In the case at bar, just as in *Argabrite* and *Gates*, the evidence shows that Deputy Johnson traveled at a high rate-of-speed, but also like the officers in *Argabrite* and *Gates*, he did so during daylight or well-lit conditions, when traffic was light, and with his lights and sirens

activated. Furthermore, like the officers in *Smith*, *Bricker*, and *Byrd*, Deputy Johnson removed his foot from the accelerator and hit the brakes in an attempt to avoid the collision. Additionally, similar to the officers in *Gates* and *Shalkhauser*, Deputy Johnson maintained a safe distance between his vehicle and Trooper Hoffman's vehicle. The totality of the circumstances fail to indicate that Deputy Johnson recklessly operated his police car.

{¶ 96} Finally, we note that law enforcement officers encounter unknown–and sometimes extremely grave–risks throughout their service to the community. Deputy Johnson believed a fellow law enforcement officer was in need of assistance. Given the uncertainty and potential for volatility law enforcement officers face, we do not find that under the circumstances present in this particular case that Deputy Johnson's decision to exceed the speed limit in order to assist a fellow officer to be unreasonable.

{¶ 97} Accordingly, based upon the foregoing reasons, we sustain appellant's first and second assignments of error and reverse the trial court's judgment.[13]

JUDGMENT REVERSED.

---

[13] Appellants also assert that the trial court erred by failing to dismiss the Gallia County Sheriff's Office from the action. Our review, however, is limited to the immunity issue. *See* footnote 1, *supra*. We therefore will not address this argument.

## JUDGMENT ENTRY

It is ordered that the judgment be reversed and that appellants recover of appellees the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Gallia County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J., McFarland, J. & Hoover, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

BY:_____
Matthew W. McFarland, Judge

BY:_____
Marie Hoover, Judge

## <u>NOTICE TO COUNSEL</u>

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.