[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Snyder v. Ohio Dept. of Natural Resources,* Slip Opinion No. 2014-Ohio-3942.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-3942

SNYDER ET AL., APPELLANTS, *v.* OHIO DEPT. OF NATURAL

RESOURCES ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Snyder v. Ohio Dept. of Natural Resources,* Slip Opinion No. 2014-Ohio-3942.]**

*Contract granting mineral-rights owners "reasonable surface rights privileges" entitles mineral-rights owners to surface-mine the property, subject to reasonableness standard of contract—No reason to believe that signatories intended to exclude surface-mining.*

(No. 2012-1723—Submitted December 10, 2013—Decided September 17, 2014.)

APPEAL from the Court of Appeals of Jefferson County, No. 11JE27, 2012-Ohio-4039.

_____

**PFEIFER, J.**

{¶ 1} Appellants, Ronald Snyder and Steven Neeley (collectively, "Snyder"), seek a declaration that they are entitled to surface-mine a reasonable portion of a tract of land to which they own the mineral rights and the state owns

the surface rights. We conclude that the court of common pleas erred when it granted summary judgment against them.

## BACKGROUND

{¶ 2} This case was decided on summary judgment by the court of common pleas. Accordingly, "our review is de novo, in accordance with the standard set forth in Civ.R. 56." *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481.

{¶ 3} Appellees, the state of Ohio and the Ohio Department of Natural Resources (collectively, "ODNR"), own a certain tract of land comprising 651.43 acres, which is located in Brush Creek Township, Jefferson County, Ohio. When the property was transferred to ODNR, the seller "reserve[d] all mineral rights, including rights of ingress and egress and reasonable surface right privileges." Snyder later acquired the mineral rights. After determining that approximately 10 percent of the land contains in excess of $2,000,000 worth of coal, Snyder informed ODNR that he wanted to surface-mine the coal. ODNR will not allow surface-mining, which Snyder claims is the only economically viable method of removing the coal.

{¶ 4} Snyder filed a complaint for declaratory judgment seeking a determination that he is "entitled to surface mine and to auger mine a small, reasonable portion" of the property. ODNR moved for summary judgment, and the court of common pleas granted the motion. The court stated that although the reservation of mineral rights implies

> the right to remove the minerals[,] [it] does not imply the right [to]
> remove them by strip mining methods. The rationale that runs
> consistently through those cases is that strip mining does not
> merely use the surface, it destroys the surface. In order for the

Grantor to reserve the right to strip mine he must expressly reserve that particular right under the line of cases cited.

**{¶ 5}** The court of appeals affirmed, and we accepted Snyder's appeal from that judgment. 134 Ohio St.3d 1448, 2013-Ohio-347, 982 N.E.2d 727.

### ANALYSIS

**{¶ 6}** The ultimate issue in this case is whether the contract language, which grants "reasonable surface right privileges," entitles Snyder to engage in strip-mining.

### Skivolocki

**{¶ 7}** In *Skivolocki v. E. Ohio Gas Co*., 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), this court analyzed the following contract language to determine whether the owner of the mineral interests had the right to strip-mine:

"[I convey] all the coal in and under the following real estate, situated in the County of Guernsey in the state of Ohio * * *.

"* * *

"Together with all necessary rights of way under said premises and through the coal aforesaid for the purpose of removing and shipping said coal and coal from adjacent lands, and the right to construct and maintain all necessary air shafts * * * and the right to lease and operate for oil and gas. Moreover it is agreed that for any and all surface used by the grantee, its successors and assigns, it or they shall pay at the rate of fifty dollars per acre. Hereby granting also to the grantee, its successors and assigns the right to use the shaft now on said premises as an air-shaft or manway for the benefit of grantees coal workings in the coal fields of which said premises are a part."

(Emphasis deleted.)  *Id.* at 246-247, quoting the deed.

{¶ 8}  In that case, we followed the well-known principle of interpreting contract language "so as to carry out the intent of the parties, as that intent is evidenced by the contractual language."  *Id*. at 247.  We emphasized two facts: (1) the deed used "language peculiarly applicable to deep mining" and (2) at the time the deed was signed, the technique of strip-mining was not known in the county where the land was located.  *Id*. at 251.  We held that

> the right to strip mine is not incident to ownership of a mineral estate.  Because strip mining is totally incompatible with the enjoyment of a surface estate, a heavy burden rests upon the party seeking to demonstrate that such a right exists.  This is especially true when the deed relied upon was executed prior to the time strip mining techniques became widely employed.

*Id.*

### Graham

{¶ 9}  In *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949 (1996), the contract language reserving a mineral interest stated:

> "There is reserved and excepted from this conveyance all of the minerals of whatsoever nature and description, including oil, gas and salt water together with the right and privilege of entering in, on, or under said premises for the purpose of exploring for, testing, mining and removing the same, and of making, constructing, driving, opening and maintaining any entries, passages, airways, shafts or slopes thereon and thereunder, or for

drilling for and producing oil, gas, or salt water or their constituents thereof, with the right to enter in and upon said premises, place and use proper equipment for drilling outlets for mine water, and the rights to occupy that portion of said surface necessary for said shafts, slopes, tanks and/or pipe lines and the right to convey and/or transport any or all of said minerals contained in and under said lands, on, in and under adjacent lands in, on or under said demised premises, except that any damage caused to fences and/or growing crops caused by such entry and transportation of said minerals shall be paid for by said Grantor, its successors, assigns and/or lessees.

"Grantee, for herself, her heirs, successors and assigns, covenants and agrees that in the event it becomes advisable and/or necessary for Grantor, its successors or assigns, to use and occupy any of the surface of said demised premises * * * for the purpose of the installation of a mine plant or facilities in connection therewith, then and in that event said Grantee, her heirs, successors and assigns, will sell and convey to Grantor, its successors or assigns, said surface acreage for the price of fifty dollars ($50.00) per acre, plus the additional cost of any improvements or additions made and placed on said surface by Grantee, her heirs, successors or assigns."

*Id*. at 314, quoting the contract.

{¶ 10} As in *Skivolocki*, 38 Ohio St.2d 244, 313 N.E.2d 374, our "search for the intent of the parties" included reviewing the language of the contract, and in *Graham*, the contract clearly contemplates only deep mining. *Graham* at 317. We characterized *Skivolocki* as holding that "the right to strip-mine for coal is not

implicit in the ownership of a severed mineral estate, and that a deed severing the estates, conveying the right to use the surface incident to coal mining, using language peculiarly applicable to deep mining, does not grant the right to strip-mine." *Id.* at 315, citing *Skivolocki* at paragraphs two and three of the syllabus. We also cited with approval a federal circuit court case and interpreted its holding as follows: "the intent of the parties is controlling, and * * * when deep-mining language is used exclusively, courts must assume that strip mining was not intended." *Graham* at 318, citing *Belville Mining Co. v. United States*, 999 F.2d 989, 993-994 (6th Cir.1993).

{¶ 11} In *Graham*, we held:

> A deed which severs a mineral estate from a surface estate, and which grants or reserves the right to use the surface incident to mining coal, in language peculiarly applicable to deep-mining techniques, whether drafted before or after the advent of strip mining, does not grant or reserve to the mineral owner the right to remove coal by strip-mining methods. (*Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, expanded and clarified.)

*Id.* at syllabus.

### *Balancing the Interests*

{¶ 12} We appreciate that the parties spent considerable time and effort in the briefs and at oral argument discussing *Skivolocki* and *Graham;* nevertheless, it is obvious to us that these cases do not answer the issue before us. The holdings in those cases are inextricably tied to the contracts at issue in the cases, and those contracts contain "language peculiarly applicable to deep-mining techniques." *Skivolocki*, 38 Ohio St.2d 244, 313 N.E. 2d 374, at paragraph three of the

syllabus; *Graham*, 76 Ohio St.3d 311, 667 N.E.2d 949, at syllabus. The mineral reservation in the contract in this case contains no language that is peculiar to deep mining.

{¶ 13} It is a truism that neither the owner of the surface interest nor the owner of the mineral interest has full ownership. Each has rights that are subject to the rights of the other. Thus, the owner of the surface interest cannot reasonably claim that no minerals can be mined, just as the owner of the mineral interest cannot reasonably expect to have unfettered access to the minerals. We have stated that when the surface interest and the mineral interest are separated, "the land is * * * rendered doubly productive" and that "the surface owner has an unequivocal right to the integrity of the surface." *Graham* at 315. Of course, neither of these statements is exactly true. Separate interests do not necessarily result in twice as much production; the right to the integrity of the surface is not sacrosanct, because it is always subject to some diminution incidental to mining.

{¶ 14} Tension between the owner of the surface interest, who seeks to maximize the value of the surface, and the owner of the mineral interest, who seeks to maximize the value of the minerals, is inevitable. "The broad principle by which these tensions are to be resolved is that each owner must have due regard for the rights of the other in making use of the estate in question. *See* 1A G. Thompson, Real Property § 164 (1980)." *Grynberg v. Northglenn*, 739 P.2d 230, 234 (Co.1987). Balancing the interests of the owners also requires full consideration of the intent of the parties. Accordingly, we return to the contract.

*Reasonable Surface-Right Privileges*

{¶ 15} The contract in this case grants to the owner of the mineral interest "all mineral rights, including rights of ingress and egress and reasonable surface right privileges." All of the words in this clause are normal words used in an ordinary way. And yet, as in *Mansaray v. State*, 138 Ohio St.3d 277, 2014-Ohio-750, 6 N.E.2d 35, the parties have reached vastly different interpretations of what

the clause means. Snyder interprets "reasonable surface right privileges" to entitle him to strip-mine a portion of the property. ODNR interprets "reasonable surface right privileges" to entitle Snyder to access the property to facilitate deep mining. As in *Mansaray*, we are not persuaded that a clause is ambiguous merely because different parties interpret the clause differently.

{¶ 16} We are disinclined to believe that strip-mining is always inconsistent with the surface owner's rights. In this case, Snyder seeks to strip-mine and auger mine approximately 10 to 15 percent of the total acreage over which he has mineral rights. We can conceive of situations in which strip-mining approximately 60 acres and then remediating that land would not be worse for the owner of the surface rights than deep mining of the entire plot, which would require extensive road access throughout the property and various mine shafts and other impediments to enjoyment of the surface. The latter situation might render the entire plot unusable for the duration of the mining, even as the former situation might have limited impact on the remainder of the land. There is no way for us to quantify the impact of either type of mining, but we are not convinced that surface mining is always worse for the owner of the surface right than deep mining; it depends on the circumstances and the reasonableness of the surface-mining.

{¶ 17} All mining, whether deep-mining or strip-mining, damages the surface interest, and strip-mining is not inherently more detrimental to the owner of the surface interest, though some of our cases might suggest otherwise. For instance, in *Skivolocki*, we stated that "strip mining is totally incompatible with the enjoyment of a surface estate." 38 Ohio St.2d at 251, 313 N.E.2d 321. Certainly that remains true with respect to the land being strip-mined, but it is no less true of land that is being used for a deep mining shaft or an access road. *See id.* at 247-248 ("customary deep mining would be destructive of the surface land due to accumulation of slag and waste, and operation of tram roads, tipples and

8

mine houses") and *Quarto Mining Co. v. Litman*, 42 Ohio St.2d 73, 80, 326 N.E.2d 676 (1975) ("mining rights include necessary uses of the surface such as the sinking of shafts, rights of way above and below the surface, use of the land for the housing of miners, and other uses"). If all mining disturbs the surface, there is no reason to believe that strip-mining is worse for the surface owner. Strip-mining is inconsistent with surface rights, but so is deep mining, and in any event, the surface owner is not sovereign. Of course, neither is the owner of the mineral rights.

{¶ 18} The parties to the contract used a phrase—"reasonable surface right privileges"—that has not been used in any reported court decisions. We are not persuaded that they intended the phrase to mean nothing other than customary ingress, egress, and concomitant surface rights. If they had, they would have used contract language that was normal and customary for that purpose.

{¶ 19} Strip-mining was well known in Jefferson County when the contract was signed. In fact, some areas of the property at issue were strip-mined before the ODNR acquired it. Thus, there is reason to believe that the signatories to the original contract understood that "reasonable surface right privileges" included the right to strip-mine, and there is no reason to believe that the signatories intended to exclude strip-mining.

## CONCLUSION

{¶ 20} In a case decided on summary judgment, we must determine whether an issue of material fact remains to be litigated, whether the moving party is entitled to judgment as a matter of law, and whether when viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can only reach a conclusion that is adverse to the nonmoving party. Civ.R. 56(C); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Here, given the unique contract language that was used, we are unable to conclude that the moving party, the ODNR, is entitled to judgment as a matter of law. To the

contrary, we are convinced that the contract entitles the owner of the mineral rights to surface-mine the property, subject to the reasonableness standard of the contract.

{¶ 21} We remand to the trial court for a determination of what is reasonable. The factors to consider are myriad and include the extent of mining (acreage and contiguousness), duration of the mining, and the quality of the remediation to be done.

Judgment reversed<br>and cause remanded.

O'CONNOR, C.J., and LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL, J., dissents.

_____

**O'DONNELL, J., dissenting.**

{¶ 22} I respectfully dissent.

{¶ 23} This case concerns whether a conveyance reserving "all mineral rights, including rights of ingress and egress and reasonable surface right privileges," permits the owner of the mineral interest to strip mine land purchased by the state to establish the Brush Creek Wildlife Area. In my view, it does not.

{¶ 24} We have long recognized the principle as

> well settled, that when one owning the whole fee, grants the minerals, reserving the surface to himself, his grantee will be entitled only to so much of the minerals, as he can get without injury to the superincumbent soil, unless, the language of the instrument clearly imports, that it was the intention of the grantor to part with the right of subjacent support.

10

*Burgner v. Humphrey*, 41 Ohio St. 340, 352 (1884). Thus, when mineral interests are severed from the surface estate, "[e]ach owner must so use his own, as not to injure the property of the other." *Id.*

**{¶ 25}** Ownership of the mineral estate " 'carries with it the right to use as much of the surface *as may be reasonably necessary* to reach and remove the minerals.' " (Emphasis added.) *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 249, 313 N.E.2d 374 (1974), fn. 1, quoting 54 American Jurisprudence 2d, Mines and Minerals, Section 210, at 389.

**{¶ 26}** In *Skivolocki*, we considered whether strip mining is a reasonably necessary use of the surface to reach the minerals and concluded that "the right to strip mine is not incident to ownership of a mineral estate," because "strip mining is totally incompatible with the enjoyment of a surface estate," and "the right to 'use' the surface cannot be reasonably construed as the right to destroy it." *Id.* at 251. Thus, one's ownership of coal does not imply the right to remove it by strip mining, even if other methods are not economically feasible, and the owner of the mineral interest bears the "heavy burden" to demonstrate that the conveyance grants the right to strip mine. *Id.*

**{¶ 27}** More recently, in *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949 (1996), we reaffirmed *Skivolocki,* noting that reserving the rights to minerals does not imply the right to strip mine the property. *Id.* at 315. There, we relied on "a long line of Ohio coal cases originating with *Burgner*" that are applicable "to the strip-mining issues of today." *Id.* We further explained:

> When the mineral and surface interests in a tract of land are severed so that use can be made of the same land by different parties, and the land is thereby rendered doubly productive, the surface owner has an unequivocal right to the integrity of the surface. The actions of the mineral owner are limited by the

obligation not to destroy or damage the surface estate unless a release from that obligation is expressly included in the deed or contract.

(Citations omitted.)  *Id.*  And we followed the decisions of other coal-producing states in recognizing that the owner of the mineral estate may not extract the minerals "by means of a technique that destroys the [surface] estate," unless the deed reserves that right " 'by clear and unequivocal language.' "  *Id.* at 317-318, quoting *Stonegap Colliery Co. v. Hamilton*, 119 Va. 271, 292, 89 S.E. 305 (1916).

**{¶ 28}** In this case, the conveyance granted the owner of the mineral interest "all mineral rights, including rights of ingress and egress and reasonable surface right privileges."  At the time of this conveyance, Ohio law recognized the mineral estate owner's duty not to damage or destroy the surface unless the deed or lease expressly released that obligation.  And our decisions in *Skivolocki* and *Graham* subsequently decided that a right to use as much of the surface as is reasonably necessary to reach and remove minerals does not imply the right to strip mine the property.  Thus, the reservation of "reasonable surface right privileges" does not clearly and unambiguously release Ronald Snyder and Steven Neeley from their duty not to injure the surface estate, nor does it satisfy their "heavy burden" to establish their right to engage in strip mining in a state wildlife area.

**{¶ 29}** Accordingly, I would affirm the judgment of the court of appeals.

_____

Vorys, Sater, Seymour & Pease, L.L.P., John K. Keller, Philip F. Downey, and William A. Sieck, for appellants.

Michael DeWine, Attorney General, Michael J. Hendershot, Chief Deputy Solicitor, and Megan Dillhoff, Deputy Solicitor, for appellee.

_____