[Cite as *Pendry v. Troy Police Dept.*, 2020-Ohio-3129.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| LAURA PENDRY, EXECUTOR | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28531 |
| | : | |
| v. | : | Trial Court Case No. 2018-CV-1676 |
| | : | |
| CITY OF TROY POLICE | : | (Civil Appeal from |
| DEPARTMENT, et al. | : | Common Pleas Court) |
| | : | |
| Defendants-Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of May, 2020.

. . . . . . . . . . .

GERALD S. LEESEBERG, Atty. Reg. No. 0000928, JOHN A. MARKUS, Atty. Reg. No. 0093736, and CRAIG TUTTLE, Atty. Reg. No. 0086521, 175 South Third Street, Penthouse One, Columbus, Ohio 43215
    Attorneys for Plaintiff-Appellant

DANIEL T. DOWNEY, Atty. Reg. No. 0063753 and PAUL M. BERNHART, Atty. Reg. No. 0079543, 7775 Walton Parkway, Suite 200, New Albany, Ohio 43054
    Attorneys for Appellees, Miami County Sheriff's Office, Chase Underwood and Todd Tennant

NICHOLAS E. SUBASHI, Atty. Reg. No. 0033953 and TABITHA JUSTICE, Atty. Reg. No. 0075440, 50 Chestnut Street, Suite 230, Dayton, Ohio 45440
    Attorneys for City of Troy Police Department, Joseph Gates, Joseph Long, Matthew Mosier, and Zachariah Bettelon

. . . . . . . . . . . .

HALL, J.

{¶ 1} Laura Pendry, as administrator of the estate of Anthony Robert Hufford, appeals from the trial court's entry of summary judgment in favor of the appellees on her personal injury and wrongful death complaint against several law-enforcement officers and two political subdivisions following a fatal high-speed police pursuit.

{¶ 2} In her sole assignment of error, Pendry challenges the trial court's summary judgment ruling. She contends genuine issues of material fact exist as to whether three police officers involved in the high-speed chase acted wantonly or recklessly, thereby negating statutory immunity.

{¶ 3} The record reflects that Troy police officer Zachariah Bettelon was driving his patrol car around 3:30 p.m. on March 27, 2017 when he heard a dispatch about a stolen pick-up truck. The dispatch reported that the vehicle was traveling south on Interstate 75 from Piqua. Bettelon also learned that the suspect had been seen crying and walking in the middle of State Route 36 before stealing the vehicle. In addition, Bettelon heard that the suspect had been reported doing "donuts" in a field and driving erratically at a high speed, going on and off of the road. Shortly thereafter, Bettelon saw the stolen truck heading south on Interstate 75. The suspect was not driving dangerously or speeding at that time. Bettelon got behind the truck and attempted to stop it with his cruiser's lights and siren activated. The suspect responded by fleeing at speeds up to approximately 100 miles per hour.

{¶ 4} About one minute later, a second Troy police officer, Joseph Gates, joined the pursuit behind Bettelon. As the suspect continued to flee, Miami County sheriff's deputy Chase Underwood unsuccessfully attempted to lay stop sticks ahead of the truck. Underwood then joined the pursuit on the interstate. Underwood initially was the fifth

cruiser in line because two Tipp City police cruisers already had joined the pursuit.[1] Underwood passed one of the Tipp City cruisers, becoming forth in line as the pursuit entered Montgomery County from Miami County at speeds up to 100 miles per hour.

{¶ 5} The stolen truck exited Interstate 75 onto Northwoods Boulevard near the airport and headed west driving erratically and speeding. The suspect slowed at Northwoods and North Dixie Drive but did not stop at the traffic light and turned left, heading south on Dixie Drive into Vandalia. The pursuit continued on Dixie Drive with the suspect frequently driving between 70 and 90-plus miles per hour, running red lights, swerving around cars, and at times traveling on the wrong side of the road. Just south of the Route 40 intersection, Bettelon reported over his radio that the stolen truck had hit another vehicle (it had taken off another car's side mirror). At that time, the Troy police officer in charge, Matthew Mosier, was monitoring the pursuit over the radio. He became concerned about the area getting more congested and consulted Troy police captain Joseph Long about calling it off. At that time, the pursuit was near the intersection of North Dixie Drive and Little York Road. When Mosier told Long the location, Long ordered the pursuit terminated. Mosier promptly ordered the Troy units (Bettelon and Gates) to stop the pursuit, and they immediately complied. Bettelon and Gates turned off their lights and sirens and exited Dixie Drive onto Sudachi Drive.

{¶ 6} When the Troy officers terminated the pursuit, a Tipp City police cruiser was first in line behind the stolen truck. Officer Underwood from Miami County was second in line. (He presumably was followed by the second Tipp City unit, which he had passed earlier.) Miami County sheriff's department lieutenant Todd Tennant also was following

---

[1] No Tipp City officers are a party to the present lawsuit.

the pursuit from a distance and monitoring it on the radio, but he did not actively join the chase. Tennant ordered Underwood to terminate the pursuit shortly after the Troy units did so. His reason for terminating was his belief that units from the Ohio State Highway Patrol had taken over. Underwood failed to hear Tennant's order to terminate due to radio static. Moments later, the stolen truck hit a vehicle driven by Anthony Hufford, who was pulling out of an apartment complex near the intersection of Dixie Drive and Stop Eight road. At the time of the collision, the stolen truck was travelling approximately 90 miles per hour. Hufford was pronounced dead at the scene. The fatal accident occurred approximately one mile and more than one minute after Troy police officers Bettelon and Gates terminated their pursuit. At the time of the collision, Underwood remained the second cruiser in line behind Tipp City. The record does not reflect precisely how far back Underwood was from the stolen truck at the time of the accident. He testified during his deposition that he was able to see the truck "at times" while on Dixie Drive. In a "Traffic Crash Witness Statement" made after the incident, Underwood described the end of the pursuit as follows:

> I heard Troy PD terminate their involvement in the pursuit. As they peeled off to the left side, Tipp City P.D. unit who was third in the pursuit became the lead cruiser and I followed 2nd. An O.S.P. cruiser turned southbound onto Dixie just in front of us. I thought it was going to take the lead but due to the speed of the pursuit, I stayed 2nd and Tipp City P.D. stayed lead. At Dixie Rd near Stop Eight Rd. I observed heavy dust and smoke. After crossing Stop Eight Rd, I observed the suspect vehicle stopped with heavy damage. * * *

{¶ 7} The record also contains a "Traffic Crash Witness Statement" from a motorist, Michael Phillips, who saw the wreck. In response to a question about whether he saw police cars chasing the stolen truck, Phillips responded: "No, sir. It seemed like a minute or so before they got here, but they all got here all at once."

{¶ 8} The trial court entered summary judgment in favor of all defendants, namely the City of Troy, Troy police officers Bettelon and Gates, Troy officer-in-charge Mosier, Troy police captain Long, the Miami County Board of Commissioners (hereinafter "Miami County"), Miami County sheriff's lieutenant Tennant, and Miami County sheriff's deputy Underwood. In its decision, the trial court found Mosier and Long entitled to summary judgment "[g]iven the limited nature and extent of their involvement in the pursuit[.]" (Order Granting Summary Judgment at 3.) The trial court also found Tennant, Mosier, and Long entitled to summary judgment given that they only had "participated in the events at a distance" and at reasonable speeds. (*Id.* at 6.) With regard to officers Bettelon, Gates, and Underwood, the trial court reasoned:

> * * * All were in constant communication with their superiors regarding the pursuit, all used active lights and sirens, all slowed at intersections, all stayed back of the apparently distraught, impaired and fleeing truck thief who, it must be noted, had begun driving erratically and at high rates of speed BEFORE law enforcement was ever dispatched to engage him and NOT AS THE RESULT OF THE PURSUIT ITSELF! Indeed, what of R.C. Section 2935.03 that imposed on the several Defendants the statutory duty to "arrest and detain, until a warrant can be obtained, a person found violating . . . a law of this state . . . ." [Footnote

omitted.] Had these several Defendants failed to discharge their duty to apprehend and detain a distraught, impaired and erratically driving truck thief, presumably they would have been sued for dereliction of duty. So it goes.

(*Id.*)

{¶ 9} The trial court then concluded as follows:

Understandably, Plaintiff relies heavily on her expert's opinion that the Troy PD and MCS officers and deputies violated their respective departments' pursuit policies. But *Argabrite* [*v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161] makes it crystal clear that a violation of departmental policy does not equate to per se recklessness or wantonness. [Footnote omitted.]

Instead, the *Argabrite* Court requires that, absent evidence that the officers and deputies (1) knew they were violating departmental policy and (2) that their violations would in all probability result in injury, summary judgment is mandated.

And how, exactly, could it be said that Troy PD and MCS law enforcement personnel involved here "knew" they were in violation of departmental policy when they were in constant contact with their supervisors regarding the circumstances of the pursuit and that they "knew" their pursuit would in all probability cause injury when the already distraught, impaired and fleeing truck thief had imperiled the public well before law enforcement had been dispatched to make a welfare check and any effort

had been made to interdict the fleeing felon?

> For the foregoing reasons, the Court GRANTS summary judgment
> for both the City of Troy Defendants and the Miami County Defendants.

(*Id.* at 6-7.)

{¶ **10**} "In a case decided on summary judgment, we must determine whether an issue of material fact remains to be litigated, whether the moving party is entitled to judgment as a matter of law, and whether when viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can only reach a conclusion that is adverse to the nonmoving party." *Snyder v. Ohio Dept. of Natural Resources*, 140 Ohio St.3d 322, 2014-Ohio-3942, 18 N.E.3d 416, ¶ 20, citing Civ.R. 56(C) and *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶ **11**} The evidence here includes deposition testimony of the law-enforcement officials involved, deposition testimony from the plaintiff's police-practices expert witness, incident reports, witness statements, a police cruiser-cam video, an accident reconstruction report, affidavits, police policy manuals, and other materials. Having examined that evidence, we see no genuine issue of material fact about what occurred on the afternoon of March 27, 2017 when police officers pursued a stolen pick-up truck. The real issue on appeal is whether reasonable minds construing that evidence in the Appellant's favor could find that any of the officers involved acted in a way that overcomes statutory immunity.

{¶ **12**} As relevant here, "an employee of a political subdivision is immune from liability *unless the employee's acts or omissions were 'with malicious purpose, in bad faith, or in a wanton or reckless manner.'* (Emphasis added.) R.C. 2744.03(A)(6)(b). This

standard applies to law-enforcement officers just as it applies to other employees of political subdivisions." *Argabrite* at ¶ 7, citing *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994). Revised Code Chapter 2744 also provides immunity for political subdivisions themselves. In particular, R.C. 2744.02(B)(1)(a) cloaks a political subdivision with immunity from liability where "[a] member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call *and the operation of the vehicle did not constitute willful or wanton misconduct.*" (Emphasis added.)

{¶ 13} The issue of statutory immunity for a political subdivision or its employees presents a question of law. *Burgin v. Eaton*, 2d Dist. Montgomery No. 24757, 2011-Ohio-5951, ¶ 26, citing *Conley v. Shearer*, 64 Ohio St.3d 284, 595 N.E.2d 862 (1992); *see also Hoffman v. Gallia Cty. Sheriff's Office*, 2017-Ohio-9192, 103 N.E.3d 1, ¶ 38 (4th Dist.). "Whether a political subdivision employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner generally are questions of fact, however. * * * Thus, a trial court may not grant summary judgment on the basis of R.C. 2744.02(B)(1)(a) or 2744.03(A)(6)(b) immunity unless reasonable minds can only conclude that the employee did not act willfully, wantonly, maliciously, reckless[ly], or in bad faith." *Hoffman* at ¶ 38, citing *Argabrite* at ¶ 15. In resolving this issue, a reviewing court must "bear in mind that while many public employees face the potential for liability under R.C. 2744.03, no other public employee faces the potential danger, violence or unique statutory responsibilities a law-enforcement officer faces. Not only does Ohio law require an officer to arrest and detain a person who is violating the law, R.C. 2935.03(A)(1), it also subjects that officer to potential criminal liability for negligently failing to do so, R.C. 2921.44(A)(2)." *Argabrite*

at ¶ 15. As the Ohio Supreme Court explained in *Argabrite*:

> An officer's role in our society creates a unique lens through which to view his or her actions and through which to determine whether those actions may have been malicious, in bad faith, wanton or reckless. We expect law-enforcement officers to protect the public, but that expectation need not mean that an officer must sit idly by while a suspect flees the scene of a crime, particularly when the suspect's flight itself endangers the general public further. The danger of a high-speed chase alone is not enough to present a genuine issue of material fact concerning whether an officer has acted with a malicious purpose, in bad faith or in a wanton or reckless manner. *Shalkhauser v. Medina*, 148 Ohio App.3d 41, 50-51, 772 N.E.2d 129 (9th Dist.2002).

*Id.* at ¶ 16.

{¶ 14} With the foregoing standards in mind, we see no error in the trial court's entry of summary judgment in favor of the City of Troy, Miami County, Troy officer-in-charge Matthew Mosier, Troy police captain Joseph Long, and Miami County sheriff's lieutenant Todd Tennant. As a threshold matter, it does not appear that the Appellant has challenged the trial court's entry of summary judgment in favor of these defendants. The "Argument" section of the Appellant's opening appellate brief does not mention any of these defendants. The Appellant argues that "[a]s municipal employees, the individual defendants are only entitled to immunity when they act in a manner which is neither reckless nor wanton." (Appellant's brief at 13.) She then asserts that "reasonable minds could easily conclude that the individual defendants' actions were more than negligent

and were in fact reckless or wanton." (*Id.*) In the remainder of her argument, the Appellant examines only the actions of Troy police officers Zachariah Bettelon and Joseph Gates and Miami County sheriff's deputy Chase Underwood. She contends a jury reasonably might find that these officers' actions were reckless or wanton. (*Id.* at 13-24.)

{¶ 15} Given the Appellant's complete failure to address the actions of Troy officer-in-charge Mosier, Troy police captain Long, and Miami County sheriff's lieutenant Tennant, she has failed demonstrate error in the trial court's summary judgment with respect to these defendants, who played supervisory roles and monitored the chase from some distance. As for the political-subdivision defendants, the Appellant's argument fails to mention them either. We note too that a finding of recklessness by any of the defendant officers would not overcome statutory immunity for the City of Troy and Miami County. As set forth above, political-subdivision immunity exists unless one of the defendant officers involved in the pursuit engaged in "willful or wanton misconduct" in the operation of a police cruiser.

The terms "willful" and "wanton" delineate "distinct degrees of care and are not interchangeable." *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 31. Willful misconduct "implies an intentional deviation from a clear duty or from a definite rule of conduct," a "deliberate purpose not to discharge some duty necessary to safety," or a purpose to engage in "wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id.* at paragraph two of the syllabus. Wanton misconduct, on the other hand, "is the failure to exercise any care [for] those to whom a duty of care is owed in circumstances in which there is great

probability that harm will result." *Id.* at paragraph three of the syllabus. *Ibrahim v. City of Dayton*, 2018-Ohio-1318, 110 N.E.3d 730, ¶ 16 (2d Dist.).

**{¶ 16}** We see no evidence from which a trier of fact reasonably could find that any of the three defendant officers involved in the high-speed chase (namely Troy police officers Bettelon and Gates, and Miami County sheriff's deputy Underwood) engaged in willful misconduct within the meaning of the immunity statute. Nor do we see a genuine issue of material fact as to whether any of them engaged in wanton misconduct. Uncontroverted summary judgment evidence demonstrates that all three officers exercised *some* care when they pursued the stolen pick-up truck. Among other things, they used lights and sirens, slowed at intersections, maintained radio contact with supervisors, attempted to deploy stop sticks to end the pursuit, backed off of the suspect at times to see if he would slow down, and two of them (the Troy officers) ultimately terminated the pursuit a mile or so before the crash. Therefore, the officers used some care, and the trial court properly granted summary judgment to the City of Troy and Miami County.

**{¶ 17}** The remaining issue, which is the focus of the Appellant's brief, is whether Troy police officers Bettelon and Gates and Miami County sheriff's deputy Underwood acted "recklessly" for purposes of overcoming their own immunity. "Reckless conduct" is " 'characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.' " *Argabrite* at ¶ 8, quoting *Anderson*, paragraph four of the syllabus. "[Recklessness] requires a finding that the probability of harm occurring is great and that the harm will be substantial. A possibility or even probability is not enough

as that requirement would place the act in the realm of negligence." *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987). "Recklessness, therefore, necessarily requires something more than mere negligence. In fact, 'the actor must be conscious that his conduct will in all probability result in injury.' " *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 74, quoting *Fabrey*, 70 Ohio St.3d at 356, 639 N.E.2d 31.

{¶ 18} The Appellant contends the record reveals genuine issues of material fact as to whether Bettelon, Gates, and Underwood acted at least recklessly in the course of the pursuit. With regard to Bettelon, the Appellant first contends the trial court overlooked the fact that he subjectively determined the suspect was impaired and distraught based on a dispatcher's report that: (1) the suspect had been seen walking in the middle of the road; (2) he looked like he had been crying; (3) he reportedly had stolen a truck and driven at a high rate of speed; and (4) he had been seen doing "donuts" in a field and repeatedly going off of the roadway. The Appellant questions whether this information was sufficient to support an objectively reasonable belief that the suspect was impaired or whether Bettelon truly had such a belief. (Appellant's brief at 15-17.)

{¶ 19} The Appellant next contends the trial court failed to consider how the suspect was driving on Interstate 75 *before* Bettelon initiated a stop. Given that the suspects driving performance was lawful at the time, although in a stolen vehicle, the Appellant contends a trier of fact reasonably might conclude that initiating a felony stop at all was wanton or reckless. (*Id.* at 17.) The Appellant contends the trial court also failed to consider whether deputy Underwood ever should have joined in the pursuit. The Appellant argues that Miami County's pursuit policy prohibited him from joining because

he was not requested or permitted to do so by a supervisor and because at least two other units already were participating in the pursuit. (*Id.* at 18.)

{¶ 20} The Appellant characterizes the pursuit as being initiated for a property crime, i.e., theft of a pick-up truck. She contends Troy's policy prohibits a pursuit for a property crime unless the suspect presents a risk of physical harm or death and there exists an immediate need for apprehension. Again, the Appellant argues that these circumstances did not exist when Bettelon attempted to stop the suspect on Interstate 75. She contends Bettelon acted at least recklessly when he continued the pursuit on Interstate 75 despite the fact that the suspect sped away at up to 100 miles per hour, weaving in and out of traffic and at times driving on the shoulder. The Appellant argues that Gates and Underwood recklessly made the pursuit more dangerous by joining it on the interstate. (*Id.* at 18-19.) In addition to terminating the pursuit on the interstate, the Appellant suggests that all of the officers could and should have terminated at other times, including "when the officers exited their jurisdiction, once the suspect exited the highway and entered a more congested area, once the suspect started driving on the wrong side of the roadway, when the suspect passed a school bus in a school zone, and when the suspect sideswiped another vehicle on N. Dixie Drive." (*Id.* at 19.)

{¶ 21} The Appellant next cites the following list of factors courts have examined to determine whether a police officer engaged in willful, wanton, or reckless misconduct in operating a police cruiser:

(1) the officer's speed; (2) whether the officer was traveling in the correct lane of travel; (3) whether the officer had the right-of-way; (4) the time of day; (5) the weather; (6) the officer's familiarity with the road; (7) the road

contour and terrain; (8) whether traffic was light or heavy; (9) whether the officer made invasive maneuvers (i.e., attempting to force the vehicle from the road) or evasive maneuvers (i.e., attempting to avoid a collision); (10) the nature and seriousness of the offense that prompted the emergency; (11) whether the officer possessed a safer alternative; (12) whether the officer admitted to disregarding the consequences of his actions; (13) whether the officer activated the vehicle's lights and sirens; and (14) whether the officer violated any applicable departmental policy.

*Hoffman,* 2017-Ohio-9192, 103 N.E.3d 1, at ¶ 49.

{¶ 22} Applying the above factors in the present case, the Appellant reasons:

* Five police units were traveling at speeds at or near 100 miles per hour;

* Officers drove on the shoulder of Interstate 75 in order to keep up with the fleeing suspect and observed the suspect driving into oncoming traffic on multiple occasions;

* Both the suspect and the Troy officers ran multiple red lights and stop signs and showed little, if any, regard for traffic on the roadway and failed to slow to reasonable speeds at intersections;

* The officers were 10-15 miles outside of their jurisdiction and less familiar with the area;

* Other vehicles, drivers, and pedestrians, including the occupants of a school bus travelling in a school zone, were all placed at extreme risk of injury because of the pursuit through both residential and commercial neighborhoods;

*The pursuit happened during rush hour with moderate to heavy traffic;

* The officers had to make multiple invasive and evasive maneuvers during the approximately 15-mile pursuit, including weaving in and out of traffic and trying to force the truck to the right lane on Interstate 75;

* The pursuit was initiated for a crime against property;

* There were safer alternatives, as there was not an immediate need for apprehension; and

* The officers violated multiple departmental policies and Ohio law.

(Appellant's brief at 20.)

{¶ 23} In light of the foregoing factors, the Appellant argues:

All of this conduct, under the circumstances, created a high likelihood of harm or death that would and should be apparent to any reasonable officer. Officer Bettelon knew this, the other officers that joined the pursuit knew this, yet every officer involved chose to continue pursuing the suspect in direct violation of departmental policy, until that risk of harm or death turned into a reality when the suspect struck and killed Anthony Hufford. When police officers engage in high-speed pursuits under these circumstances, it is absolutely foreseeable that the pursuit is likely to result in physical harm or death. That is precisely the reason high-speed pursuit policies have been enacted—to prohibit initiation of any pursuit where the need for immediate apprehension does not outweigh the inherent dangers of such pursuits, and mandate termination of such pursuits.

(Appellant's brief at 20-21.)

{¶ 24} The Appellant next asserts that the *Argabrite* case cited by the trial court is distinguishable. Although that case involved a high-speed police pursuit, the Appellant argues that the underlying offense was burglary and that the suspect driver had struck a police car and fled through residential yards prior to the pursuit. The Appellant also argues that the pursuit in *Argabrite* involved "moderate" speeds. (Appellant's brief at 21-22.) Although the Ohio Supreme Court found no recklessness as a matter of law in *Argabrite*, the Appellant contends the present case involves different facts.

{¶ 25} Finally, the Appellant reiterates her belief that Bettelon, Gates, and Underwood did not establish their entitlement to summary judgment. She argues that they failed to establish the absence of a genuine issue of material act as to whether they acted recklessly. She argues their denial of violating departmental police-pursuit policy is not dispositive. She reasons that the trial court's decision "permits a police officer to act recklessly and plead ignorance after doing so without consequence." (*Id.* at 23.) Finally, based on the evidence before us, the Appellant insists that the issue of recklessness must be submitted to a jury for resolution. Therefore, she urges reversal of the trial court's decision as it relates to Bettelon, Gates, and Underwood.

{¶ 26} Having reviewed the record, we see no error in the trial court's entry of summary judgment in favor of Troy police officers Bettelon and Gates and Miami County deputy Underwood. Viewing the evidence and all reasonable inferences in a light most favorable to the Appellant, we do not believe a trier of fact could find that any of these officer acted recklessly. In reaching this conclusion, we bear in mind the Ohio Supreme Court's observation of an officer's "unique lens" on their actions and the potential danger, violence or unique statutory responsibilities faced by officers. *Argabrite* at ¶ 16. Notably,

the *Argabrite* court recognized that an officer is not obligated to "sit idly by while a suspect flees the scene of a crime, particularly when the suspect's flight itself endangers the general public further." *Id.* The majority also concluded that "the danger of a high-speed chase alone is not enough to present a genuine issue of material fact concerning whether an officer has acted * * * in a * * * reckless manner." *Id.*

{¶ 27} Contrary to the Appellant's argument, reasonable minds could not conclude that Bettelon initiated a stop on the highway solely because the suspect stole a truck. The Appellant concedes that a dispatcher also had advised Bettelon about the suspect reportedly walking in the middle of the road and crying before the theft and then driving erratically and at a high rate of speed before the officer observed him. (*See* Bettelon depo. at 48.) These additional facts reasonably caused Bettelon to believe the suspect might be impaired and pose an immediate threat to the public. This remained true even though the suspect was not driving erratically at the moment when Bettelon initiated a stop. Moreover, we consider it the officers' sworn duty to at least attempt a traffic stop of a stolen vehicle.

{¶ 28} Nor are we persuaded by the Appellant's argument that the trial court ignored Underwood's violation of departmental policy by joining the pursuit. The Appellant argues that the policy precluded Underwood from joining a pursuit if two other units already were involved. The Appellant claims Underwood violated the policy because four other units were in pursuit when he joined the chase. Although Underwood disputes the Appellant's reading of the policy, we see no genuine issue of material fact on the issue of recklessness even if he did violate departmental policy. In *Argabrite*, the Ohio Supreme Court concluded that a violation of departmental policy does not create a genuine issue

of material fact as to whether the violator acted recklessly absent evidence that the violator knew he was violating the policy and knew his violation" in all probability" would result in injury. *Argabrite* at ¶ 25. Here the record contains no evidence to support a finding that Underwood knew joining the pursuit violated departmental policy. This is particularly true given that he remained in contact with a supervisor who did not order him to terminate the pursuit based on the policy. The record also contains no evidence to support a finding that Underwood knew having five cruisers involved rather than four in all probability would result in injury.

{¶ 29} The Appellant further argues that Bettelon violated departmental policy by initiating a pursuit for a property crime where the suspect did not present a risk of physical harm or death and there was no need for immediate apprehension. As set forth above, however, the undisputed facts supported a reasonable belief that the seemingly unstable and distressed suspect was impaired and posed a risk of physical harm to others. Once again, however, we see no genuine issue of material fact on the issue of recklessness even if Bettelon did violate the policy. On the record before us, no trier of fact could conclude that Bettelon knew initiating his pursuit of the suspect on Interstate 75 in all probability would result in injury. Nor do we see a genuine issue of material fact as to whether any of the three officers acted recklessly by continuing the pursuit on Interstate 75 and Northwoods Boulevard, which was in a largely commercial/ industrial area with light traffic. Having reviewed Bettelon's cruiser-camera video, we note that roads were dry, and the weather was clear. Based on our examination of the video, we do not believe a trier of fact reasonably could find that Bettelon, Gates, or Underwood acted recklessly during this portion of the pursuit. We see no evidence to support a finding that they knew

their actions in all probability would result in injury when pursuing the suspect on Interstate 75 and Northwoods Boulevard. Therefore, they did not act recklessly as a matter of law.

{¶ 30} In our view, the only real issue is whether any of the three officers acted recklessly by continuing the pursuit after exiting Northwoods Boulevard and turning southbound onto Dixie Drive where the pursuit continued for 4 or more miles. On this portion of the relatively wide and straight 4- and sometimes 5-lane road, the officers continued their use of lights and sirens in part to warn other motorists and pedestrians about the suspect's flight. Bettelon, the driver of the lead cruiser for most of the pursuit, testified in his deposition that he was familiar with the entire route the suspect travelled. The officers slowed at intersections, periodically backed off from the suspect to see if he would slow down, and maintained radio contact with their supervisors. We note too that Troy officers Bettleon and Gates did terminate the pursuit when it was felt that the risks outweighed the law-enforcement benefit. Even if the timing of this decision might be questioned with the benefit of hindsight, the officers' termination the pursuit when they did, in consultation with their supervisors, constituted at most negligence under the circumstances before us. In reaching this conclusion, we note that Bettelon and Gates discontinued their pursuit well before the crash. The Appellant's own evidence demonstrates that Bettelon was so far behind the suspect that he lost sight of the suspect's truck before terminating the pursuit. (Plaintiff's Memo Contra Summary Judgment at Drago Exh. A 011.) As for Gates, he was behind Bettelon. The evidence also establishes that more than one minute elapsed from the time Bettelon and Gates stopped the pursuit until the crash. (*Id.* at Exh. A 012.) This timing is consistent with an incident report Bettelon completed after the crash. (Troy Defendants' Motion for Summary

Judgment at Justice Affidavit Exh. 1 p. 10.)

{¶ 31} As for Underwood, he continued the pursuit behind a Tipp City cruiser after Bettelon and Gates pulled off. Underwood also had been made aware of the suspect's unusual behavior prior to stealing the truck and his erratic driving thereafter. Based on the information known to him and the circumstances of the pursuit, Underwood reasonably could have believed the suspect posed a danger to the public that outweighed the risks of the pursuit. He also testified in his deposition that his only role prior to the crash was backing up the Troy cruisers and, later, the Tipp City cruiser ahead of him. Even if Underwood's assessment of the situation might be questioned in hindsight, no reasonable juror could conclude that he acted recklessly merely by following one or more other cruisers ahead of him at various times during the pursuit.   As the Ohio Supreme Court observed in *Argabrite*, reckless conduct is "'characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.' " (Citation omitted.) *Argabrite* at ¶ 8 "These are rigorous standards that will in most circumstances be difficult to establish, especially with respect to a law-enforcement officer carrying out the statutory duty to arrest and detain a person violating the law." *Id*. Based on the evidence before us, we hold that Underwood did not act recklessly, as a matter of law, by engaging in the conduct that he did.

{¶ 32} Finding no error in the trial court's entry of summary judgment in favor of the Appellees, we overrule the Appellant's assignment of error. The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. concurs.

FROELICH, J., concurs in judgment only.

Copies sent to:

Gerald S. Leeseberg
John A. Markus
Craig Tuttle
Daniel T. Downey
Paul M. Bernhart
Nicholas E. Subashi
Tabitha Justice
Hon. Steven K. Dankof